**E. Howard HUNT, Jr., Plaintiff,**

v.

**William O. BITTMAN et al., Defendants.**

**Civ. A. No. 77–1724.**

United States District Court, District of Columbia.

Jan. 9, 1980.

Rufus King and Rufus King, III, Washington, D.C., for plaintiff.

Lawrence E. Carr, Jr., and Edward J. Lopata, Washington, D.C., for defendant Bittman.

Daniel A. Rezneck and Thomas D. Nurmi, Washington, D.C., for defendants Mintz et al.

MEMORANDUM

GASCH, District Judge.

This is an action for legal malpractice brought by E. Howard Hunt, Jr., a

convicted Watergate burglar and conspirator,[1] against his former counsel, William O. Bittman and the general partners of Hogan & Hartson. Defendants move the Court for a dismissal on the ground that plaintiff's action is barred by the statute of limitations. Defendants Mintz et al., the general partners of Hogan & Hartson, also move for a dismissal on the ground that plaintiff suffered no legal injury in connection with defendants' representation of him. Plaintiff opposes defendants' motions, and also moves for partial summary judgment on the issue of liability. Defendants oppose plaintiff's motion. For the reasons set forth below, the Court treats defendants' motions to dismiss as motions for summary judgment,[2] enters summary judgment for defendants, and does not reach plaintiff's motion for partial summary judgment.

## BACKGROUND

On June 17, 1972, District of Columbia police arrested four men from Miami,[3] who were found inside the headquarters of the Democratic Party's National Committee in the Watergate office complex. "Arrested with them was James McCord,[4] a former CIA agent who was then employed as a security officer by the Committee for Re-Election of the President [Richard M. Nixon] (CRP); the next few days brought the arrest of their immediate supervisors in the bizarre enterprise: [plaintiff] E. Howard Hunt,[5] a former CIA agent who was then, or had recently been, employed as a 'consultant' to the White House, with an office in that building, and G. Gordon Liddy,[6] a former White House employee who was then employed as General Counsel to the Finance Committee for the Re-Election of the President (FRCP)." [7]

On July 3, 1972, plaintiff Hunt retained defendant Bittman and the law firm of Hogan & Hartson to represent plaintiff in connection with proceedings arising out of the Watergate break-in. In September 1972 the grand jury charged plaintiff in a six-count indictment with conspiracy, burglary, and illegal interception of oral and

1.. See *United States v. Hunt*, 168 U.S.App.D.C. 374, 514 F.2d 270 (D.C. Cir. 1975) (en banc) (per curiam) (affirming the district court's denial of Hunt's motion to withdraw his plea of guilty to charges of conspiracy, burglary, and illegal interception of oral and wire communications).

2. Because matters outside the pleadings were presented to and considered by the Court on defendants' motions to dismiss on the ground that plaintiff's cause of action is barred by the statute of limitations, the Court treats these motions to dismiss as motions for summary judgment and disposes of them as provided in rule 56 of the Federal Rules of Civil Procedure. *Fagan v. National Cash Register Co.*, 157 U.S. App.D.C. 15, 26 n.25, 481 F.2d 1115, 1126 n.25 (D.C. Cir. 1973); *Irons v. Schuyler*, 151 U.S. App.D.C. 23, 28, 465 F.2d 608, 613 (D.C. Cir.), *cert. denied*, 409 U.S. 1076, 93 S.Ct. 682, 34 L.Ed.2d 664 (1972). This treatment is required under these circumstances by rule 12 of the Federal Rules of Civil Procedure and requires no formal prior notice to the parties where, as here, the parties have engaged in extensive discovery on the statute of limitations issue and have had a full and fair opportunity to submit all materials pertinent to this issue. 6 Moore's Federal Practice ¶ 56.02, at 56–32 to –33 (2d ed. 1979) (citing *Fagan v. National Cash Register Co.*, supra, and *Irons v. Schuyler, supra* ).

3. See *United States v. Barker*, 168 U.S.App. D.C. 312, 514 F.2d 208 (D.C. Cir.) (en banc) (affirming the district court's denial of the four Miami men's motions to withdraw their pleas of guilty to seven counts of an indictment arising out of the Watergate break-in), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975).

4. See *United States v. McCord*, 166 U.S.App. D.C. 1, 509 F.2d 334 (D.C. Cir. 1974) (en banc) (affirming the conviction of McCord on three counts of illegal interception of oral and wire communications, two counts of possession of intercepting devices, two counts of burglary, and one count of conspiracy), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

5. See note 1 *supra*.

6. See *United States v. Liddy*, 166 U.S.App.D.C. 95, 509 F.2d 428 (D.C. Cir. 1974) (en banc) (affirming the conviction of Liddy on one count of conspiracy, two counts of burglary, and three counts of illegal interception of oral and wire communications), *cert. denied*, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975).

7. *United States v. Barker*, 168 U.S.App.D.C. 312, 315, 514 F.2d 208, 211 (D.C. Cir.) (en banc) (footnotes omitted), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975).

wire communications. In December 1972, shortly after his wife was killed in an airplane crash, plaintiff decided to plead guilty to any or all of the charges against him. His decision to plead guilty was based on the overwhelming amount of evidence against him and the emotional strain he was suffering as a result of his wife's death.[8]

On January 10, 1973, Bittman announced in open Court that Hunt wished to plead guilty to three of the six counts of the indictment, and represented that the Government agreed to allow Hunt to plead guilty to these three counts and to dismiss the remaining three counts.[9] The prosecutor indicated that Bittman's representation was accurate, and that such a disposition was acceptable to the Government.[10] Judge Sirica took the matter under advisement.[11] On the following day, January 11, 1973, Judge Sirica refused to accept Hunt's plea to only three counts.[12] In view of this ruling, Hunt agreed to plead guilty to all six counts.[13] Judge Sirica accepted this plea after determining that Hunt understood the charges against him, had committed the crimes with which he was charged, was entering the plea voluntarily, and had discussed the plea with and was entirely satisfied with the services of his attorney, Bittman.[14]

On March 23, 1973, Hunt appeared for sentencing before Judge Sirica. On that date, Judge Sirica provisionally sentenced Hunt to prison, and advised Hunt to cooperate fully with the authorities;[15] Hunt was incarcerated immediately thereafter. In July 1973 the Watergate Special Prosecutor indicated that there was a possibility of a conflict of interest between Hunt and Bittman. As a result, on August 16, 1973, Bittman and the firm of Hogan & Hartson withdrew as Hunt's counsel. Succeeding defendants as Hunt's counsel were Sidney S. Sachs and the law firm of Sachs, Greenebaum & Tayler.

In September 1973 Hunt, represented by new counsel, filed a motion to withdraw his guilty plea and to dismiss the indictment. In November 1973 Judge Sirica denied this motion. Two days later, on November 9, 1973, Judge Sirica imposed a final sentence on Hunt of from thirty months to eight years in prison and a fine of $10,000.

Hunt appealed the denial of his motion to withdraw the guilty plea and to dismiss the indictment. On January 2, 1974, by Order of the Court of Appeals, Hunt was released from prison pending resolution of his appeal. In February 1975 the Court of Appeals, sitting en banc, unanimously affirmed Judge Sirica's decision.[16] Two months later, on April 25, 1975, Hunt returned to prison, where he remained until he was released on parole on February 23, 1977.

Plaintiff Hunt filed this action on September 30, 1977, seeking $5 million in compensatory damages and $5 million in punitive damages. His amended complaint sets forth four counts. The first count alleges that defendants were negligent in their representation of Hunt. This count further alleges that defendants' acts and omissions directly and proximately caused Hunt's imprisonment, loss of reputation, loss of earnings, and distress.

**8.** Deposition of E. Howard Hunt, Jr., at 229, 1183.

**9.** Defendants' Exhibit 34, at 1–3.

**10.** *Id.* at 3–5.

**11.** *Id.* at 7.

**12.** Defendants' Exhibit 74, at 1–4.

**13.** *Id.* at 4.

**14.** *Id.* at 4–16.

**15.** Defendants' Exhibit 95, at 33–40.

**16.** *United States v. Hunt*, 168 U.S.App.D.C. 374, 376, 514 F.2d 270, 272 (D.C. Cir. 1975) (en banc) (per curiam). The Court of Appeals did, however, vacate the sentences on the three counts that the Government had agreed to dismiss as part of the plea agreement, which Judge Sirica had refused to accept. *Id.*, 168 U.S.App.D.C. at 375 n.2, 514 F.2d at 271 n.2. This decision in effect enforced the plea agreement negotiated by the Watergate Special Prosecutor's office and defendant Bittman, acting on Hunt's behalf.

Each of the remaining three counts incorporates the allegations made in count I, and sets forth a different legal theory for recovery on the same allegations. The second count alleges that defendants committed the acts and omissions complained of in count I "recklessly, willfully, fully knowing and foreseeing the consequential damages to [Hunt], and with intent to injure [him]." [17] The third count alleges that defendants "conspired with other attorneys, individual and corporate persons, and public officials" to commit the acts and omissions complained of in count I. [18] The final count alleges that defendants' acts and omissions complained of in count I deprived Hunt of his civil rights.

The factual allegations set forth in count I and incorporated in the remaining three counts can be summarized as follows: (1) that defendants provided inadequate representation to Hunt in the Watergate case in several respects; [19] (2) that Bittman engaged in a conspiracy with White House and CRP officials and other lawyers to pro-

tect individuals in the White House at the expense of the interests of Hunt and other Watergate defendants; and (3) that Bittman's loyalties became divided between himself and Hunt after Bittman became the target of a criminal investigation as a result of his transmitting payments to Hunt.

*DISCUSSION*

A. *The "Injury" Rule.*

■ Legal malpractice claims in the District of Columbia [20] "may not be brought" more than three years "from the time the right to maintain the action accrues." D.C. Code § 12–301 (1973); [21] see *Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson*, 127 U.S.App.D.C. 93, 94, 381 F.2d 261, 262 (D.C. Cir. 1967), *cert. denied*, 390 U.S. 946, 88 S.Ct. 1033, 19 L.Ed.2d 1135 (1968); *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992, 994 (D.C.1978). In determining when a legal malpractice claim "accrues," the District of Columbia follows the so-called "injury" rule. Under this rule, a claim for legal malpractice accrues when the plaintiff-client suffers actual injury. [22]

17. Amended Complaint ¶ 13.

18. *Id.* ¶ 15.

19. Among the specific allegations of inadequate representation are the following: (1) that defendants failed to counsel Hunt to cooperate with the authorities; (2) that defendants failed to raise certain defenses, such as "executive authorization," on Hunt's behalf; (3) that Bittman failed to represent Hunt adequately in the plea bargaining with the prosecutor; and (4) that Bittman counseled Hunt to perjure himself.

20. The sole basis of jurisdiction in this Court for Hunt's legal malpractice claim is diversity of citizenship, 28 U.S.C. § 1332 (1976). In adjudicating a claim based solely on diversity jurisdiction, federal courts must make certain that the outcome of the litigation is substantially the same as it would be if the case were brought in a State court. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 108–09, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Therefore, to reach substantially the same result as would the Superior Court of the District of Columbia, this Court must, and accordingly does, apply District of Columbia law to determine whether Hunt's claim is barred by the statute of limitations.

21. Section 12–301 of the District of Columbia Code provides in full as follows:

Except as otherwise specifically provided by law, actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues:

(1) for the recovery of lands, tenements, or hereditaments—15 years;

(2) for the recovery of personal property or damages for its unlawful detention—3 years;

(3) for the recovery of damages for an injury to real or personal property—3 years;

(4) for libel, slander, assault, battery, mayhem, wounding, malicious prosecution, false arrest or false imprisonment—1 year;

(5) for a statutory penalty or forfeiture—1 year;

(6) on an executor's or administrator's bond—5 years; on any other bond or single bill, covenant, or other instrument under seal —12 years;

(7) on a simple contract, express or implied—3 years;

(8) for which a limitation is not otherwise specially prescribed—3 years.

This section does not apply to actions for breach or contracts for sale governed by § 28:2–725.

D.C. Code § 12–301 (1973).

22. In *Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson, supra,* the United States Court of Appeals for the District of Columbia Circuit held that the same principles should govern the

*Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson, supra,* 127 U.S.App.D.C. at 94, 381 F.2d at 262; *Weisberg v. Williams, Connolly & Califano, supra,* 390 A.2d at 995 & n.5.

In applying the "injury" rule to the factual circumstances presented here, the Court must determine when Hunt suffered actual injury. If, on the one hand, Hunt suffered his injury before October 1, 1974— that is, more than three years before he filed his complaint on September 30, 1977— then his claim is barred by the statute of limitations. If, on the other hand, Hunt suffered his injury on October 1, 1974 or anytime thereafter, then his claim is not barred by the statute of limitations.

The parties do not agree on the date on which plaintiff suffered injury. Plaintiff contends that he suffered injury on or after October 1, 1974. Hunt urges the Court to select one of the following as the date on which or period during which he suffered injury: (1) February 25, 1975—the date on which the Court of Appeals affirmed Judge Sirica's decision denying Hunt's motion to withdraw his guilty plea; or (2) April 25, 1975 to February 23, 1977—the period during which Hunt was incarcerated following the affirmance of Judge Sirica's decision.

Defendants, on the other hand, argue that Hunt suffered injury before October 1, 1974. They urge the Court to select one of the following three dates as the date on which Hunt suffered injury: (1) January 11, 1973—the date on which Hunt pleaded guilty; (2) March 23, 1973—the date on which Hunt was incarcerated immediately following his provisional sentencing; or (3) November 9, 1973—the date on which Hunt received his final sentencing.

Decisions in which courts have applied the "injury" rule in legal malpractice cases offer some guidance in selecting the date on which Hunt suffered injury. In *Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson, supra,* the District of Columbia Circuit addressed the question of when the statute of

limitations begins to run on a malpractice action against attorneys who allegedly gave improper legal advice. In that case, the attorneys had drawn up a contract by which plaintiff-appellant would send its boats to fish in Venezuelan waters and sell the fish to a Venezuelan processor who would in turn resell the fish to a third party. The contract contained a provision stating that the laws of Venezuela did not require any change in the then American registry of plaintiff-appellant's boats. After executing the contract, plaintiff-appellant sent its boats to the Venezuelan waters where they were impounded because their entry under American registry was illegal. Applying the "injury" rule, the *Fort Myers* court concluded that the statute of limitations began to run on the date on which the boats were impounded and that therefore plaintiff-appellant's suit was timely filed.

In *Weisberg v. Williams, Connolly & Califano, supra,* the District of Columbia Court of Appeals addressed the question of "when the statute of limitations begins to run on a malpractice action against an attorney who has failed to timely file a client's claim." 390 A.2d at 994. The appellate court declined to provide a definitive answer to this question, stating: "we need not, and cannot, pinpoint the precise moment when in all cases the cause of action for legal malpractice based on negligently allowing the statute of limitations to run on a client's claim accrues." *Id.* at 995.

The *Weisberg* court further declined to provide a clear answer to the question of when the legal malpractice claim of the plaintiffs-appellants in that case accrued. It first noted that the trial court had concluded that the cause of action accrued when the statute of limitations defense was first pleaded against plaintiffs-appellants. *Id.* at 994, 995 n.6. The *Weisberg* court then rejected "as well beyond the point at which appellants suffered injury" both the date on which plaintiffs-appellants' successor attorney informed them that the judge

accrual of a legal malpractice claim as govern ordinary negligence claims. 127 U.S.App.D.C. at 94, 381 F.2d at 262. In *Weisberg v. Wil-* *liams, Connolly & Califano, supra,* the District of Columbia Court of Appeals expressly approved of this holding. 390 A.2d at 994.

had ruled that the statute of limitations period had run on part of their claims and the date on which plaintiffs-appellants finally settled the case for less than they would have in the absence of defendants-appellees' alleged negligence in handling their case, and concluded simply that "the facts of record here clearly support [the trial court's] holding that the statute of limitations period had run on appellants' legal malpractice claim against appellees." *Id.* at 995.

On the basis of the foregoing authorities and under the factual circumstances presented here, the Court concludes that Hunt suffered injury no later than March 23, 1973. On that date, Hunt was sentenced to prison and immediately incarcerated on the criminal charges to which he had pleaded guilty on January 11, 1973. The Court rejects as well beyond the point at which Hunt suffered injury the date of February 25, 1975—on which the Court of Appeals affirmed Judge Sirica's decision denying Hunt's motion to withdraw his guilty plea—and the period of April 25, 1975 to February 23, 1977—during which Hunt was incarcerated following the affirmance of Judge Sirica's decision. The Court therefore holds that Hunt's legal malpractice claim against defendant accrued on or before March 23, 1973 and that the three-year statute of limitations period began to run on his claim no later than that date.

### B. The "Fraudulent Concealment" Doctrine.

In *Weisberg v. Williams, Connolly & Califano, supra,* the District of Columbia Court of Appeals stated that "[i]t is well settled that fraudulent concealment of the existence of a cause of action tolls the running of a conventional statute of limitations." 390 A.2d at 995. The *Weisberg* court then indicated that the "fraudulent concealment" doctrine applies to legal malpractice claims in the following manner:

> And in the legal malpractice field, there is widespread agreement that the statute will not run where the existence of a cause of action for legal malpractice has

been fraudulently concealed by affirmative misrepresentations. Concealment will exist if the attorney has knowingly made false representations; it is only then that his conduct, by way of estoppel or otherwise, will toll the running of the statute.

*Id.* at 995–96. The *Weisberg* court also made two other points about the application of the "fraudulent concealment" doctrine to legal malpractice claims. First, it noted that "a fraudulent concealment tolls a statute of limitations only for so long as the concealment endures." *Id.* at 996. Second, the court emphasized that " 'one well established defense to a claim of fraudulent concealment is that the plaintiff knew, or by the exercise of due diligence could have known, that he may have had a cause of action.' " *Id.*

Mindful of principles articulated by the *Weisberg* court, the Court turns to consider whether the "fraudulent concealment" doctrine saves Hunt's legal malpractice claim from the statute of limitations bar. In resolving this question, the Court will first address the three basic factual allegations set forth in plaintiff's amended complaint, and then consider his argument that six particular matters were fraudulently concealed from him.

■ As indicated above, the amended complaint contains three basic allegations. The first of these allegations is that defendants provided inadequate representation to plaintiff in the Watergate case in several respects. Hunt makes the following specific allegations of inadequate representation: (1) that defendants failed to counsel Hunt to cooperate with the authorities prior to the imposition of his final sentence; (2) that defendants failed to raise certain defenses, such as "executive authorization," on Hunt's behalf; (3) that Bittman failed to represent Hunt adequately in plea bargaining with the prosecutor; and (4) that Bittman counseled Hunt to perjure himself.

The record indicates that each of these four specific allegations of inadequate representation was known by Hunt before October 1, 1974. With regard to the first of

these four allegations, the record indicates that Hunt was fully aware of the importance of cooperating with the authorities before October 1, 1974. At Hunt's provisional sentencing on March 23, 1973, Judge Sirica personally advised Hunt of the importance of cooperating with the authorities.[23] Moreover, Hunt's published memoirs indicate that defendants, who represented him until August 1973, "had consistently counseled cooperation with the authorities,"[24] and his contemporaneously recorded diary indicates that defendants "advised full cooperation."[25] Finally, another contemporaneous document, written by one of the defendants and dated May 3, 1973, indicates that Hunt was advised "to testify fully and truthfully."[26]

With regard to the second allegation of inadequate representation, the record indicates that Hunt was fully aware of the possible defense of "executive authorization" before October 1, 1974. In his deposition, Hunt frankly conceded that defendants, who represented him until August 1973, discussed this defense with him,[27] and that he felt that the case should not be defended on that theory.[28] Moreover, a contemporaneous memorandum, written by Bittman and dated July 5, 1973, confirms that Hunt was informed of the defense of "executive authorization" and that he did not want to defend the case on that theory.[29] Finally, Hunt must have been aware of this defense by September 1973, when his new counsel, Mr. Sachs, raised it in Hunt's motion to withdraw the guilty plea and to dismiss the indictment.

With regard to the third allegation, the record indicates that Hunt was fully aware of the adequacy of Bittman's plea bargaining with the prosecutor before October 1, 1974. In his deposition Hunt admitted that his allegation of inadequate plea bargaining was "speculation," and this speculation was not based on any facts at all and certainly not based on any facts learned by him after 1973.[30] Moreover, the only basis for this speculation was that other Watergate defendants had received more favorable treatment from the Government than Hunt did—facts that Hunt admitted knowing in 1972 and 1973 when those defendants received their more favorable treatment.[31] Furthermore, the plea bargain between Bittman and the special prosecutor was rejected by Judge Sirica, who insisted on a plea to all counts.[32]

Finally, with regard to the fourth allegation, it is clear that Hunt was fully aware of Bittman's alleged advice to commit perjury before October 1, 1974. If Bittman, who represented Hunt until August 1973, did counsel Hunt to perjure himself, then Hunt must have known of this advice at the time it was allegedly given.

The second of the three basic allegations contained in the amended complaint is that Bittman engaged in a conspiracy with White House and CRP officials and other lawyers to protect individuals in the White House at the expense of the interests of Hunt and the other Watergate defendants. With regard to this allegation, the record indicates that Hunt knew of Bittman's alleged participation in this conspiracy before October 1, 1974.

This same allegation of conspiracy by the original Watergate defense counsel, including Bittman, was made publicly by James W. McCord, Jr., Hunt's codefendant in the Watergate case, in an unsuccessful effort to

23. Defendants' Exhibit 95, at 36–40.

24. Defendants' Exhibit 7, at 311.

25. Defendants' Exhibit 69, at 7.

26. Defendants' Exhibit 38, at 1.

27. Deposition of E. Howard Hunt, Jr., at 232–33.

28. *Id.* at 242–43.

29. Defendants' Exhibit 15, at 6.

30. Deposition of E. Howard Hunt, Jr., at 171–76.

31. *Id.*

32. *But see* note 16 *supra.*

have his conviction reversed.[33] On June 8, 1973, McCord filed a motion seeking an acquittal or a new trial in which he argued that·his trial had been prejudiced by the existence of conspiracy to obstruct justice.[34] In his affidavits supporting this motion filed on August 9 and October 10, 1973, McCord alleged that his original Watergate lawyers and defendant Bittman participated in this conspiracy, which attempted to keep McCord and the other Watergate defendants silent about the involvement of White House and CRP officials in the Watergate episode.[35] Moreover, in his brief filed with the District of Columbia Circuit on February 14, 1974, McCord again publicly asserted and further expanded upon his conspiracy allegations.[36] Finally, on March 15, 1974, Hunt sent to his then counsel, C. Dickerson Williams, a copy of an article about McCord appearing in the *Washington Post* on the same date.[37] This article described McCord's filing of a motion to vacate his conviction in which he alleged that Bittman had participated with White House and CRP officials in the Watergate coverup conspiracy.[38]

The final basic allegation contained in the amended complaint is that Bittman's loyalties became divided between himself and Hunt after Bittman became the target of a criminal investigation as a result of his transmitting payments to Hunt. With regard to this allegation, the record indicates that Hunt knew before October 1, 1974 that Bittman was under scrutiny for his possible involvement in the transmission of payments to Hunt.

Hunt had knowledge of this conflict-of-interest allegation from many sources. A Jack Anderson column,[39] which appeared in the *Washington Post* on April 17, 1973 and of which Hunt was aware at the time it appeared,[40] described Bittman's alleged role in transmitting payments to the Watergate defendants. Two days after the column appeared, on April 17, 1973, Hunt was questioned before the grand jury about Bittman's alleged involvement in transmitting these payments.[41] Moreover, Hunt knew when defendants withdrew as his counsel in August 1973 that the reason for their withdrawal was the Watergate Special Prosecutor's assertion of a possible conflict of interest between Hunt and Bittman arising out of Bittman's alleged role in the transmission of payments.[42] Finally, Hunt knew on March 1, 1974 that Bittman was named an unindicted coconspirator in the Watergate coverup indictment and that he had been a target of a criminal investigation as a result of his alleged role in the transmission of payments.[43]

Under these circumstances, the Court concludes that Hunt knew before October 1, 1974 about the three basic allegations of inadequate representation, conspiracy, and conflict of interest contained in his amended complaint. The Court therefore holds that all of these three basic allegations fall within the knowledge defense of the

---

**33.** *See United States v. McCord,* 166 U.S.App. D.C. 1, 18–20, 509 F.2d 334, 351–53 (D.C. Cir. 1974) (en banc) (rejecting as without merit McCord's allegation that his original Watergate lawyers had more loyalty to the White House than to McCord and thus had not fully represented McCord's interests), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d·87 (1975).

**34.** Motion of Defendant James W. McCord, Jr., in the Nature of a Writ of Error Coram Nobis at 11–12, *United States v. Liddy,* Crim. No. 1827–72 (D.D.C.) (filed June 8, 1973).

**35.** Affidavit of James W. McCord, Jr., *United States v. Liddy,* Crim. No. 1827–72 (D.D.C.) (filed August 9, 1973); Affidavit of James W. McCord, Jr., *United States v. Liddy,* Crim. No. 1827–72 (D.D.C.) (filed October 10, 1973).

**36.** Brief for Appellant at 16–17, *United States v. McCord,* 166 U.S.App.D.C. 1, 509 F.2d 334 (D.C. Cir. 1974) (filed February 14, 1974), *cert. denied,* 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

**37.** Defendants' Exhibit 195.

**38.** *Id.* at 2.

**39.** Defendants' Exhibit 21.

**40.** Deposition of E. Howard Hunt, Jr., at 299.

**41.** *Id.* at 302–03.

**42.** *Id.* at 336–37, 374–81.

**43.** *Id.* at 308.

"fraudulent concealment" doctrine and that Hunt's claim based on these allegations is not saved from the statute of limitations bar by this doctrine.

The Court next considers plaintiff's argument that the running of the statute of limitations was tolled by defendants' fraudulent concealment of certain matters from him. He alleges that the following matters were fraudulently concealed from him: (1) the filing on his behalf of an opposition to an ACLU motion to file an amicus curiae brief in the Watergate case several months after the convictions of Hunt and his codefendants; (2) the subsequent "doctoring" of defendants' internal index file to conceal the fact that the opposition to the ACLU motion had been filed; (3) the representation of defendant Bittman by Herbert J. Miller, Jr.; (4) defendant Bittman's withdrawal from Hogan & Hartson; (5) the testimony of several Hogan & Hartson partners in 1975 before a federal grand jury; and (6) the November 14, 1972 memorandum written by Hunt.

None of these six allegations is sufficient under the "fraudulent concealment" doctrine to save Hunt's claim from being barred by the statute of limitations. Plaintiff's first and second allegations—which relate to the opposition to the ACLU motion—are without basis. The record indicates that Hunt received a copy of the ACLU motion from defendant Bittman in June 1973 and "read it immediately upon receipt."[44] The record further indicates that, rather than being concealed, the opposition was properly filed with the Clerk of the Court and was a matter of public record.[45]

Plaintiff's third and fourth allegations are similarly without basis. With regard to the third allegation, the record indicates that Hunt was aware by the fall of 1973 that Miller was representing defendant Bittman.[46] With regard to the fourth allegation, the record indicates that Hunt was aware by July 1974 of defendant Bittman's withdrawal from Hogan & Hartson.[47]

Plaintiff's fifth and sixth allegations are also without basis. In plaintiff's fifth point, he alleges fraudulent concealment by counsel in respect to certain testimony given by them before the grand jury in 1975. It is uncontroverted that at the time this testimony was given, these defendants no longer represented Hunt. Accordingly, an essential basis for the contention of fraudulent concealment is lacking. Finally, with regard to the sixth allegation, the record indicates that Hunt, as the author of the November 12, 1972 memorandum, was aware of the memorandum and its contents.[48]

Under these circumstances, the Court rejects as without merit Hunt's argument relating to defendants' fraudulent concealment of these six matters. The Court therefore holds that the "fraudulent concealment" doctrine does not save Hunt's cause of action from the statute of limitations bar, and that Hunt had knowledge of the existence of what he characterizes as his cause of action against defendants before October 1, 1974.

## C. The "Disability" Statute.

█ In a final effort to avoid the statute of limitations bar to his claim, Hunt relies on the District of Columbia disability statute, D.C. Code § 12–302(a) (1973). This statute provides in pertinent part that "when a person entitled to maintain an action is, at the time the right accrues: . . . (3) imprisoned—he or his proper representative may bring action within the time limited after the disability is removed." *Id.* This provision is inapplicable to the factual

---

44. *Id.* at 274–75, 290.

45. Opposition of Defendant E. Howard Hunt to Motion of American Civil Liberties Union to File Brief Amicus Curiae, *United States v. Liddy*, Crim. No. 1827–72 (D.D.C.) (filed June 29, 1973).

46. Deposition of E. Howard Hunt, Jr., at 324–25, 341–42.

47. Deposition of William A. Snyder, at 165–66.

48. Deposition of E. Howard Hunt, Jr., at 52.

circumstances presented here. Even assuming, as Hunt contends, that the statute of limitations were tolled when Hunt was imprisoned from March 23, 1973 until January 2, 1974, his release from prison on the latter date would have removed this disability and commenced the running of the statute. Therefore, even under this assumption, Hunt's action would have been brought more than three years after the statute of limitations began running and accordingly is barred by the three-year limitations period.

### CONCLUSION

For the foregoing reasons, the Court concludes that Hunt's legal malpractice claim against defendants accrued no later than March 23, 1973—the date on which Hunt was incarcerated immediately following his provisional sentencing. The Court further concludes that Hunt's claim was not saved from the statute of limitations bar by the "fraudulent concealment" doctrine or by the disability statute.

Under these circumstances, the Court holds that Hunt's claim for legal malpractice against defendants is barred by the three-year statute of limitations. The Court therefore enters summary judgment for defendants on this ground and finds no occasion to address defendants Mintz *et al.*'s argument that Hunt suffered no legal injury in connection with defendants' representation of him and plaintiff's motion for partial summary judgment on the issue of liability.