QUALITY INNS INTERNATIONAL, INC., A DELAWARE CORPORATION v. BOOTH, FISH, SIMPSON, HARRISON AND HALL, A NORTH CAROLINA PARTNERSHIP, KONRAD K. FISH, ROY M. BOOTH, H. MARSHALL SIMPSON, A. WAYNE HARRISON, RICHARD D. HALL, JR., FREDERICK C. E. MURRAY, E. JACKSON HARRINGTON, JR. AND ROBERT A. BENSON

No. 8118SC1063

(Filed 6 July 1982)

1. **Attorneys at Law § 5.1; Judgments § 41; Mortgages and Deeds of Trust § 27— manner of conducting foreclosure sale—consent judgment as res judicata**

    A consent order agreed to by plaintiff showing that a motel foreclosure sale did not leave a surplus because the amount of the approved bid was less than the outstanding indebtedness was *res judicata* on the issue of a surplus from the sale and estopped plaintiff from asserting that defendant attorney was negligent in giving plaintiff creditor advice as to how much to bid at the foreclosure sale so as to avoid a surplus payable to the defaulting debtor and in conducting the sale as substitute trustee in a manner so that a surplus was created.

2. **Attorneys at Law § 5.1— malpractice action—errors of judgment—summary judgment**

    In an action against attorneys to recover damages on theories (1) that defendant attorneys lacked that degree of knowledge and skill ordinarily possessed by attorneys handling real estate transactions and (2) that defendants failed to use reasonable care and diligence in handling plaintiff's problems with respect to recovering the personal property in a motel, summary judgment was properly entered for defendants where the forecast of evidence showed that the problem with which defendants were entrusted grew from an uncertain and unsettled area of the law relating to "wrap-around" mortgages, that there was no bad faith on the part of defendants, and that plaintiff seeks to hold defendants liable in damages for asserted errors of judgment.

1

APPEAL by plaintiff from *Collier, Judge.* Order entered 14 May 1981 in Superior Court, GUILFORD County. Heard in the Court of Appeals 25 May 1982.

In its complaint, plaintiff set out two claims for relief. As to its first claim, plaintiff's unverified complaint alleged, in summary, the following events and circumstances:

5. On . . . August 30, 1973, the plaintiff executed a note payable to First Union National Bank in the face amount of Six Hundred Thousand Dollars ($600,000.00) . . . . The terms of the First Union Note provided that the plaintiff would pay the principal and interest in monthly installments of Six Thousand, Ninety Dollars ($6,090.00) beginning on October 1, 1973, and ending on October 1, 1983. As security for the First Union Note, the plaintiff executed a Deed of Trust conveying certain property . . . in Greensboro, North Carolina . . . known as the "Quality Inn Central" . . . ("Motel") to Eugene B. Graham, III, as Trustee for First Union . . . . The First Union Deed of Trust was recorded on August 31, 1973, in Book 2668 at Page 688 of the Guilford County Registry.

6. On or about December 6, 1974, the plaintiff sold the Motel to Peter M. Watts and Saundra C. Watts . . . ("Watts"). As part of this transaction, Watts executed and delivered to the plaintiff a Note in the principal amount of Six Hundred Eighty-Four Thousand, Three Hundred and Fifty-Three Dollars and Seven Cents ($684,353.07) . . . . The payment schedule contained in the Watts Note was, in part, designed to coincide with that of the First Union Note, on which the plaintiff remained primarily liable. The Watts Note was secured by the Watts Deed of Trust, which conveyed to William Dunlop White, Jr., as Trustee, the same property conveyed by the First Union Deed of Trust.

7. The plaintiff and Watts intended that the Watts Deed of Trust would constitute a "wrap around" mortgage which would encompass the obligation evidenced by the First Union Note and the First Union Deed of Trust. The plaintiff was obligated to use the payments received under the Watts Note to reduce its obligation under the First Union Note.

8. On . . . April 21, 1976, Watts conveyed the Motel to Petlin, Incorporated. As part of this transaction, Petlin assumed all of the obligations of Watts under the Watts Note and Watts Deed of Trust.

9. Or [sic] . . . June 9, 1977, Petlin, Incorporated conveyed the Motel to Greenway Motel, Inc. . . . ("Greenway"). As part of this transaction, Greenway assumed the Watts Note and the Watts Deed of Trust.

10. After this conveyance, Greenway began making all of the installment payments required under the Watts Note and Deed of Trust to the plaintiff until September, 1977, after which time Greenway failed to make any further payments. After this default in the payment of the Watts Note, the plaintiff requested defendant Fish, as Substitute Trustee under the Watts Deed of Trust, to institute foreclosure proceedings.

11. A foreclosure hearing was held on October 3, 1978, and, as a result thereof, the Clerk of Superior Court of Guilford County entered an order authorizing the Substitute Trustee to sell the Motel. The unpaid balance of the Watts Note at the time was approximately Six Hundred One Thousand Six Hundred Dollars ($601,600.00).

12. Prior to the foreclosure sale, officers of the plaintiff consulted with defendant Fish, as attorney for the plaintiff, with regard to the amount which the plaintiff should bid at the sale. It was the intention of the plaintiff, as expressed to defendant Fish, to bid an amount below the amount of the outstanding indebtedness on the Watts Note so as not to create a surplus payable to the debtor in default. Defendant Fish advised the plaintiff as to the required application of the proceeds of the sale and approved of the plaintiff's decision to enter a bid of Five Hundred Eighty-Five Thousand Dollars ($585,000.00) at the sale.

13. Prior to the foreclosure sale, defendant Fish, as Trustee, published and posted a Notice of Sale, advertising that the Motel was to be sold on October 26, 1978. The Notice provided that the sale would be "subject to" the First Union Deed of Trust. No mention was made in the Notice of the

plaintiff's obligation and intention to apply the proceeds of the sale to the outstanding balance due on the First Union Note.

14. On or about October 26, 1978, defendant Fish, as Trustee, conducted the foreclosure sale of the Motel. At the sale, defendant Fish announced that the Motel was being sold "subject to" the First Union Deed of Trust. Defendant Fish did not state that the plaintiff was obligated and intended to apply the proceeds of the sale to the outstanding balance due on the First Union Note. The plaintiff was the highest and only bidder at the sale, with a bid of Five Hundred and Eighty-Five Thousand Dollars ($585,000.00).

15. On or about November 6, 1978, an attorney for Greenway wrote a letter to defendant Fish, as Trustee, demanding payment of Five Hundred Five Thousand Dollars ($505,000.00) which it claimed as a surplus created by the plaintiff's bid of Five Hundred Eighty-Five Thousand Dollars ($585,000.00). Greenway contended that since the sale was "subject to" the First Union Deed of Trust, the amount of the indebtedness on the Watts Note was reduced by operation of the sale to an amount less than Fifty Thousand Dollars ($50,000.00).

16. As a result of this claim by Greenway, and the plaintiff's conflicting demand that the entire proceeds of the sale be delivered to it, defendant Fish, as Trustee, filed a motion in the foreclosure proceeding requesting direction from the Court as to how to proceed in completing the sale. At the same time, defendant Fish and defendant Law Firm withdrew as counsel for the plaintiff in the foreclosure proceeding.

17. The plaintiff hired new counsel to represent it in the foreclosure proceeding and incurred substantial costs and expenses, including attorney's fees, in resisting Greenway's claim for the alleged "surplus" resulting from the foreclosure sale. This issue was ultimately resolved by the execution of a settlement agreement between Greenway and the plaintiff which required the plaintiff to pay a substantial sum of money to Greenway.

18. The substantial expenses incurred by the plaintiff in resisting and ultimately settling Greenway's claim were necessitated by the merits of the claim. In part, Greenway's claim was based on the failure of defendant Fish, as Trustee, to announce publicly, either in the published Notice of Sale or at the sale itself, that, while the Motel was being sold "subject to" the First Union Deed of Trust, the Watts Deed of Trust "wrapped around" the First Union Deed of Trust and that the plaintiff was obligated to apply the proceeds of the sale to the outstanding balance on the First Union Note. This omission by defendant Fish constituted a breach of his fiduciary duty as Trustee and further reflected a failure on his part to use reasonable care and diligence in the performance of his duties as Trustee. Defendant Fish is therefore liable to the plaintiff for the damages proximately caused by this omission, including, but not limited to, the expenses the plaintiff incurred in resisting and settling Greenway's claim for the surplus of the foreclosure sale.

In its second claim, plaintiff alleged, in summary, the following events and circumstances:

. . .

20. Upon Greenway's default on the Watts Note, the plaintiff employed defendant Law Firm for the purpose of enforcing all of its rights pertaining to the Motel. In particular, the plaintiff instructed defendant Law Firm to institute foreclosure proceedings on the Watts Deed of Trust, to enforce the plaintiff's security interest in certain personal property located on the Motel premises, and to seek to have a receiver appointed to operate the Motel during the pendency of the foreclosure proceedings.

. . .

23. In consulting defendant Fish prior to the foreclosure sale with regard to an appropriate bid, the plaintiff was relying on the judgment and expertise in real estate matters of defendant Fish and defendant Law Firm. In advising the plaintiff, defendant Fish never discussed with officials of the plaintiff the possibility that a bid of Five Hundred Eighty-Five Thousand Dollars ($585,000.00) would create a substan-

tial surplus payable to the debtor in default. Further, defendant Fish did not mention the possible defects in the published Notice of Sale or in the announcement which he, as Trustee, would make at the sale. Had the plaintiff been aware of these potential problems, it would have taken some action to eliminate any potential claim by the debtor for a surplus arising out of its bid.

24. By making a bid of Five Hundred Eighty-Five Thousand Dollars ($585,000.00) at the foreclosure sale after consulting with defendant Fish and relying on his advice, the plaintiff exposed itself to Greenway's claim for the surplus resulting from the sale. . . .

25. Notwithstanding the plaintiff's request that defendant Law Firm enforce its security interest in certain personal property located on the Motel premises, no member of defendant Law Firm took any action to institute appropriate proceedings in this regard. Further, the plaintiff was never informed by defendant Law Firm that no such action would be taken.

26. Defendant Law Firm's failure to enforce the plaintiff's security interest enabled Greenway to maintain possession and use of the personal property during the pendency of the foreclosure proceeding, thus diminishing the value of the property and causing injury to the plaintiff.

27. Defendant Law Firm assigned the task of seeking the appointment of a receiver for the Motel to defendant Benson, at that time an employee of the firm. Defendant Benson was unsuccessful in his efforts to have a receiver appointed primarily because the petition he prepared was not limited to the Motel property but sought to place the entire Greenway corporation in receivership.

28. This failure by defendant Law Firm to have a receiver appointed for the Motel enabled Greenway to operate the Motel during the pendency of the foreclosure proceeding, thus resulting in substantial injury to the plaintiff.

29. Defendant Fish continued to act as both attorney for the plaintiff and as Trustee under the Watts Deed of Trust

after the institution of the foreclosure proceedings on said deed of trust and after it became apparent that Greenway could contest the proceeding. Defendant Fish and defendant Law Firm did not withdraw as counsel for the plaintiff until after the foreclosure sale, at which point it became necessary for the plaintiff to employ new counsel. The plaintiff therefore incurred substantial additional expenses in hiring and educating new counsel.

30. The acts and omissions of defendant Fish, Benson and the other members of defendant Law Firm with regard to the foreclosure on the Watts Deed of Trust, the enforcement of the plaintiff's security interest in the personal property located on the Motel premises, and the appointment of a receiver for the Motel reflect either a want of that degree of knowledge and skill ordinarily possessed by attorneys handling commercial real estate transactions or a failure to use reasonable care and diligence in handling these matters. The defendants are therefore guilty of legal malpractice and negligence and are liable to the plaintiff for those damages proximately caused by these acts and omissions, . . . .

In their answer, defendant moved to dismiss, admitted that at the 3 October 1978 hearing, the Clerk of Superior Court had determined the unpaid balance on the note to be $601,600.00, and admitted that Fish, as substitute trustee, had conducted the foreclosure sale at which plaintiff bid $585,000.00, and denied the other material allegations of plaintiff's complaint. Defendant also asserted the defenses of contributory negligence and lack of consideration, asserting that plaintiffs have neither paid defendants for Fish's services as trustee nor for legal advice rendered prior to 3 October 1978. Defendant also counterclaimed for trustee's fees. As to defendant's counterclaim, plaintiff denied its material allegations, and asserted that defendant Fish was negligent in performing his duties as trustee and thus was not entitled to trustee's fees.

After the pleadings were joined, both parties conducted discovery. Plaintiff directed interrogatories to defendant Konrad Fish and deposed Fish and Robert A. Benson. Defendant also directed interrogatories to plaintiff and took depositions of Thomas S. Stukes and Richard A. Lieppe, partners in the law

firm of Smith, Moore, Smith, Schell and Hunter, and William T. Rightsell, Greenway's counsel. Defendant then moved for summary judgment. Defendant's motion was supported by affidavits of Fish and R. D. Douglas, III and J. T. Carruthers, Jr., Greensboro attorneys in real estate practice. In opposition to defendant's motion, plaintiff submitted an affidavit of Everett F. Casey, Staff Attorney for plaintiff.

Upon review of the materials before him, Judge Collier granted defendants' G.S. 1A-1, Rule 56(c) motion for summary judgment. From entry of that judgment, plaintiff appeals. Additional facts will be discussed, as necessary, in the body of the opinion.

*Pfefferkorn & Cooley, P.A., by David C. Pishko, for plaintiff-appellant.*

*Adams, Kleemeier, Hagan, Hannah & Fouts, by Daniel W. Fouts, M. Jay DeVaney, and Beth H. Daniel, for defendant-appellee.*

WELLS, Judge.

Plaintiff's claims for relief are grounded in tort, asserting defendants' negligence in the performance of their duties as trustee under the deed of trust and as lawyers owing a duty to plaintiff as a client. In regard to summary judgment in a negligence action, our Supreme Court has stated:

> As a general proposition, issues of negligence are ordinarily not susceptible of summary adjudication either for or against the claimant "but should be resolved by trial in the ordinary manner." 6 Pt. 2 Moore's Federal Practice, § 56.17[42] at 946 (2d ed. 1980). Hence, it is only in exceptional negligence cases that summary judgment is appropriate because the rule of the prudent man, or other applicable standard of care, must be applied, and ordinarily the jury should apply it under appropriate instructions from the court. *Caldwell v. Deese,* supra; Gordon, the New Summary Judgment Rule in North Carolina, 5 Wake Forest Intra. L. Rev. 87, 92 (1969).

*Vassey v. Burch,* 301 N.C. 68, 269 S.E. 2d 137 (1980); *see also Easter v. Hospital,* 303 N.C. 303, 278 S.E. 2d 253 (1981). In *Lowe*

*v. Bradford,* 305 N.C. 366, 289 S.E. 2d 363 (1982), our Supreme Court explicated the burden of proof on a summary judgment motion:

> A party moving for summary judgment may prevail if it meets the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim. *Moore v. Fieldcrest Mills, Inc.,* 296 N.C. 467, 251 S.E. 2d 419 (1979); *Zimmerman v. Hogg & Allen,* 286 N.C. 24, 209 S.E. 2d 795 (1974). Generally this means that on "undisputed aspects of the opposing evidential forecast," where there is no genuine issue of fact, the moving party is entitled to judgment as a matter of law. 2 McIntosh, *North Carolina Practice and Procedure* § 1660.5, at 73 (2d ed. Supp. 1970). If the moving party meets this burden, the non-moving party must in turn either show that a genuine issue of material fact exists for trial or must provide an excuse for not doing so. *Econo-Travel Motor Hotel Corp. v. Taylor,* 301 N.C. 200, 271 S.E. 2d 54 (1980); *Moore v. Fieldcrest Mills, Inc.,* 296 N.C. at 470, 251 S.E. 2d at 421-22; *Zimmerman v. Hogg & Allen,* 286 N.C. at 29, 209 S.E. 2d at 798. . . .

> If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to "set forth *specific facts* showing that there is a genuine issue for trial." Rule 56(e), Rules of Civil Procedure (emphasis added). The non-moving party "may not rest upon the mere allegations of his pleadings." *Id.*

[1] Plaintiff's first claim relates to defendant Fish's conduct as substitute trustee in the Watts' deed of trust, and to the manner in which Fish conducted the foreclosure sale. In essence, plaintiff asserts that it sought to have the property foreclosed in a manner so as to avoid creating a surplus payable to Greenway, and that as a result of the advice plaintiff received from Fish as to how much plaintiff should bid at the sale, a surplus was in fact created, which surplus Greenway claimed. Plaintiff further asserts that as a result of Greenway's assertion of its claim to an alleged surplus, plaintiff was damaged by having to pay Greenway $30,000.00 to settle Greenway's claim, plus incurring addi-

tional legal fees and other expenses in connection with Greenway's claim. The record shows, however, that following Greenway's claim to an alleged surplus resulting from the foreclosure, Fish filed a motion before the Clerk, seeking instructions as to how to dispose of the proceeds of the foreclosure sale. The matter was subsequently transferred to the civil issue docket of the Superior Court. On 25 June 1979, Judge Collier entered a consent order disposing of all issues in the foreclosure proceedings. The order consented to by plaintiff, provides, in pertinent part, as follows:

[U]pon the Motion in the Cause of the Trustee . . . and upon the Consent Order . . . for trial of all issues, and it appearing to the Court that Quality Inns International, Inc. ("Quality") and Greenway Motels, Inc. ("Greenway") have compromised and settled all matters and disputes between them and have agreed that the subject foreclosure sale should be confirmed and that the Substitute Trustee should thereupon prepare and file his final report of sale and deliver a deed to Quality upon payment of the bid as herein provided . . . ;

NOW, THEREFORE, BY CONSENT IT IS ORDERED, ADJUDGED, AND DECREED that:

1. Pursuant to said agreement of compromise and settlement between Greenway and Quality, *Greenway has agreed to withdraw and hereby withdraws all its objections and claims in this proceeding. Accordingly, the foreclosure sale in this proceeding is confirmed in all respects;*

. . .

3. The Substitute Trustee shall . . . prepare and file his final report of sale and deliver a deed to Quality upon payment of its bid. *Said final report shall indicate a last and highest bid by Quality in the amount of Five Hundred and Eighty Five Thousand Dollars ($585,000.00) against indebtedness at the time of foreclosure sale in the amount of Six Hundred Four Thousand Five Hundred Eighty Seven and 46/100 Dollars ($604,587.46).* Quality shall be entitled to pay said bid by crediting said bid, after payment of costs, to the above stated indebtedness and shall not be required to pay said bid in cash. . . . (Emphasis added.)

Judge Collier's order shows that the foreclosure sale did not leave a surplus, as the amount of the bid approved was less than the outstanding indebtedness. Judge Collier's order is *res judicata* on the issue of a surplus from the sale.[1] *See Complex, Inc. v. Furst and Furst v. Camilco, Inc., and Camilco, Inc. v. Furst*, 43 N.C. App. 95, 258 S.E. 2d 379 (1979), *disc. rev. denied*, 299 N.C. 120, 261 S.E. 2d 923 (1980). Having consented to the order, plaintiff is estopped in this action to assert that the manner in which defendant Fish carried out the foreclosure sale resulted in a surplus. *See Lockleair v. Martin*, 245 N.C. 378, 96 S.E. 2d 24 (1956). An essential element of plaintiff's claim, a surplus, being nonexistent, summary judgment for defendants as to this issue was properly granted. *See Lowe*, supra.

Plaintiff's second claim for relief alleges that defendants were negligent in failing to take timely and adequate measures to secure plaintiff's rights in the personal property of the motel, and that defendants, as attorneys for plaintiff, were negligent in advising plaintiff as to how much to bid at the foreclosure sale. Plaintiff's contention as to the latter claim, as we read the somewhat confusing complaint, is that plaintiffs intended to submit a sufficiently low bid at the real property foreclosure sale so as to leave Greenway indebted to plaintiff, so that plaintiff could then recover or repossess the personal property to cover the remaining debt, and that when a surplus was created by plaintiff's bid, this means of recovery of the personalty was lost to plaintiff, causing financial loss. We need not reach the merits of this claim, since, for the reasons previously stated in our opinion, we find that plaintiff is estopped by judgment to plead the existence of a surplus. We therefore overrule this assignment of error.

[2] The specific allegation of negligence upon which plaintiff bases its final claim for relief is that defendants delayed taking legal action to secure plaintiff's rights to the personal property and revenues of the motel during the foreclosure proceeding, thus causing a financial loss to plaintiff. The evidence of the timing and circumstances of the events relevant to this point is conflicting.

---

1. As to estoppel by judgment generally, *see King v. Grindstaff*, 284 N.C. 348, 200 S.E. 2d 799 (1973); *Phillips v. Phillips*, 46 N.C. App. 558, 265 S.E. 2d 441 (1980). As to consent judgments operating as *res judicata* generally, *see* Annot., 91 A.L.R. 3d 1170.

Plaintiff's evidence tends to show that during the summer of 1978, plaintiff became concerned that Greenway was violating the terms of the separate security agreement covering the personal property of the motel, by selling the motel's television sets and by failing to apply the motel's revenues to motel maintenance. In plaintiff's answer to defendants' interrogatories, plaintiff claimed that defendant Benson was first asked to seek appointment of a receiver for the motel on 15 August 1978. However, Everett Casey stated in his affidavit that he first asked Benson to file a petition for a receiver on 6 September. Casey also stated in his affidavit that he only mailed Benson a copy of the Greenway security agreement on 15 September. On 21 September, Casey also asked Benson to institute a claim and delivery proceeding. Defendants did file petitions for appointment of a receiver on 6 October and 26 October. Apparently no action was taken on the first petition, and the second petition was denied. A subsequent petition made by Smith, Moore, Smith, Schell and Hunter was granted, and on 10 November 1978 the motel was placed under the control of a receiver.

By their interrogatories and affidavits from Benson and Fish, defendants produced a forecast of evidence showing the following. Benson advised plaintiff that their security agreement on the personalty had never been incorporated into the real property deed of trust; thus, plaintiff could not recover the personal property by foreclosing on that deed of trust. Benson stated that he prepared the documents for a claim and delivery proceeding, but Casey told him not to go ahead with it until after the foreclosure. Benson also stated that he and Casey discussed the relative merits of having a receiver appointed many times. Benson advised Casey that they did not need a receiver to make them whole; the foreclosure proceeding was an adequate remedy. Benson also advised that the foreclosure hearing was scheduled for 3 October; it would be difficult to get a receiver appointed before the foreclosure hearing; and any appointment might delay the foreclosure proceeding. On approximately 15 September, Casey told Benson to wait indefinitely on filing the petition; on 3 October, Weldon Humphrey told Benson that he, Humphrey, was trying to get a receiver. On 10 October, after receiving a copy of the security agreement which was mailed 15 September, Benson wrote to Greenway, notifying them of the default and demanding

that Greenway return the personal property. Finally, Benson stated that at all times, he believed he was following plaintiff's instructions while advising them to the best of his ability, and that in fact, plaintiff did not suffer any loss, financial or otherwise in regard to the personal property.

Plaintiff seeks to proceed against defendants on two theories, or types, of malpractice: one, that defendants lacked that degree of knowledge and skill ordinarily possessed by attorneys handling real estate transactions, and two, that defendants failed to use reasonable care and diligence in handling plaintiff's problems with respect to recovering the personal property in the motel. The forecast of evidence presented by defendants in support of their summary judgment motion clearly shows that the genesis of plaintiff's problems with respect to plaintiff's entitlement to the personal property in the motel was in plaintiff's uncertainty as to how to proceed with the foreclosure of the real property. Defendant's forecast shows that defendants were aware that plaintiff regarded the Watts deed of trust as a "wrap-around" mortgage, or at least intended it to be such, but that plaintiff was uncertain as to how to effectively foreclose such a mortgage so as to not create a surplus to which Greenway might assert claim or which Greenway might use to retain possession of the personal property of the motel. Plaintiff's own forecast of evidence also reflects uncertainty of the law and appropriate strategy on plaintiff's part. Affidavits and depositions of skilled lawyers for both parties reflect that the so-called "wrap-around" mortgage is an area of real property law not well understood by property lawyers in North Carolina, and further, that the foreclosure of such a mortgage is fraught with questions and uncertainty.[2]

The test of lawyer liability in such cases was set out by our Supreme Court in *Hodges v. Carter*, 239 N.C. 517, 80 S.E. 2d 144 (1954), as follows:

> Ordinarily when an attorney engages in the practice of law and contracts to prosecute an action in behalf of his

---

2. Our research has disclosed only one commentary as to this type of real estate financing, *see* "Wrap-around Financing: A Technique for Skirting the Usury Laws?" 1972 Duke L.J. 785 (1972), and only one case dealing with a "wrap-around" mortgage, *J. M. Realty Investment Corp. v. Stern*, 296 So. 2d 588 (Fla. Dist. Ct. App. 1974).

client, he impliedly represents that (1) he possesses the requisite degree of learning, skill, and ability necessary to the practice of his profession and which others similarly situated ordinarily possess; (2) he will exert his best judgment in the prosecution of the litigation entrusted to him; and (3) he will exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to his client's cause. (Citations omitted.)

An attorney who acts in good faith and in an honest belief that his advice and acts are well founded and in the best interest of his client is not answerable for a mere error of judgment or for a mistake in a point of law which has not been settled by the court of last resort in his State and on which reasonable doubt may be entertained by well-informed lawyers. (Citations omitted.)

*Accord,* Mallen and Levit, Legal Malpractice, § 213 (2nd ed. 1981).[3] *See also* Mallen and Davis, "Attorneys' Liability For Errors of Judgment—at the Crossroads," 48 Tenn. L. Rev. 283 (1981); "Attorney Malpractice," 63 Colum. L. Rev. 1292 (1963); 7 Am. Jur. 2d, Attorneys at Law, § 201; Annot., 59 A.L.R. 3d 1176, § 2[a]; Annot., 45 A.L.R. 2d 5, § 3.

The forecast of evidence in this case clearly shows that plaintiff seeks to hold defendants liable in damages for asserted errors of judgment. The forecast of evidence shows that there was no bad faith on defendants' part, and that the problem with which defendants were entrusted grew from an uncertain and unsettled area of law. Defendants were therefore entitled to judgment as a matter of law on plaintiff's malpractice claim.

The judgment of the trial court is

Affirmed.

Judges HEDRICK and ARNOLD concur.

---

3. Mallen and Levit discuss lawyer judgmental liability at length in Chapter 9 of their above cited work. Their discussion emphasizes the perils associated with judgmental hindsight applied to unsettled questions of law in legal malpractice cases.