**MARTINSON MANUFACTURING CO., INC., Appellant,**

v.

**Robert W. SEERY, Appellee.**

No. 69095.

Supreme Court of Iowa.

June 13, 1984.

Lawrence L. Marcucci and Frederick B. Anderson of Williams, LaMarca, Marcucci & Wiggins, P.C., West Des Moines, for appellant.

Richard G. Langdon, Ross A. Walters, and Kermit B. Anderson of Herrick, Langdon & Langdon, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and McCORMICK, SCHULTZ, CARTER, and WOLLE, JJ.

REYNOLDSON, Chief Justice.

Plaintiff Martinson Manufacturing Co., Inc., filed a malpractice action against its former counsel, defendant Robert W. Seery, alleging damages caused by defendant's misinterpretation of an Internal Revenue Code provision. Following trial, judgment was entered upon a jury verdict for defendant. Plaintiff appealed and the court of appeals affirmed. After granting plaintiff's application for further review, we now affirm.

Plaintiff is an Iowa corporation located in Sheffield, Iowa, and engaged in producing a "pitless well adapter" for residential water systems. Through another corporation, Western Irrigation Valve Corporation (Wivco), William J. Burrows, Richard Williams and Walter Hart owned the controlling interest in the plaintiff corporation. In 1973 these three and Dan Sanderson had acquired an 80 percent interest in an Arizona enterprise manufacturing amplifying equipment for performing groups, with Burrows and Williams each owning 24 percent. They incorporated this enterprise as Barnum Industries, Inc.

These Iowa investors borrowed $200,000 from the Iowa-Des Moines National Bank to make the purchase. Initially it was thought Barnum had a profitable contract to produce its equipment. In 1974, however, Barnum was in financial trouble and by June 1975 it had sought reorganization under chapter 11 of the bankruptcy laws. Among other obligations was a $285,000 debt to the Iowa-Des Moines National Bank that the Iowa investors personally had guaranteed. They also had made additional investments in, and advancements to, the Arizona business. Burrows and Williams caused the plaintiff, Martinson, to advance over $100,000 to Barnum without prior approval of the Martinson board. They also were paying interest on the Iowa bank loan.

In the summer and fall of 1975 Burrows developed a plan to merge Martinson and Barnum. In this he had the tax and professional advice of Williams, a noted tax attorney and partner of defendant Seery. The acquisition plan was designed to use the net operating losses (NOLS) of Barnum to free up funds that Martinson otherwise would pay in income taxes. These funds would be used to pay off the original owners of Martinson (who still held veto power over major corporate expenditures) and to repay Barnum's bank loans and other indebtedness. Barnum thus would be released from chapter 11 reorganization, and made solvent as required by the Internal Revenue Code in order for Martinson to use its NOLS. Burrows, on the witness stand, opined this tax money was essential to the success of the acquisition, without which Martinson "simply would not have done the deal."

Burrows testified the business objectives of the merger were diversification for Martinson and transfer of the Barnum operations to Iowa where they could be supervised more closely. He admitted, however, that he and Williams would derive substantial personal benefit when Martinson assumed the Barnum debts that the four Iowa investors had guaranteed.

Martinson bought approximately 2½ percent of Barnum stock from a third party on September 30, 1975.

As the plan finally was presented to Martinson's board of directors on March 4, 1976, it called for the purchase of the Iowa investors' 80 percent of Barnum's stock, 40

percent upon approval of the plan "and the remaining one-half ... in October or November, 1976."

Williams, who was terminally ill, attended only the morning portion of the March 4, 1976, meeting. Thereafter he was unable to participate materially in relevant events. Defendant Seery took his place at the meeting. At trial he testified he relied on Williams' expertise on the tax aspects of obtaining Barnum's NOLS for Martinson. It is clear from the record that at a later August 5, 1976, meeting he told the Martinson board this tax benefit would be available.

Defendant assisted Martinson in obtaining a bank loan to carry out the acquisition plan. After another meeting on October 4, 1976, the Martinson board of directors, upon defendant's advice, voted to acquire the 80 percent of the Barnum stock owned by the Iowa investors "in one chunk." This was accomplished October 15, 1976. This last transaction, of course, occurred more than one year following Martinson's first acquisition of 2½ percent of Barnum stock. The two companies then were merged on December 31, 1976. The Barnum operation continued as a money loser for Martinson, losing about $400,000 before it was closed down.

In January 1977, Martinson's certified public accountants took the position that Barnum's NOLS were unavailable for Martinson's tax return because of Barnum's insolvency. Defendant apparently acquiesced in this position, although questioning their rejection of fair market value of assets for use of book value only.[1] As a result, the Barnum purchase was reflected on the Martinson tax returns for the 1976–77 and subsequent fiscal years as an investment write-off of about $567,344 rather than as a net operating loss of $887,059. This diminished the tax savings available to Martinson.

Relations between defendant and plaintiff then deteriorated. This was exacerbat-ed by defendant's action as a minority stockholder in Martinson to organize other stockholders to recover company losses from Burrows based on his alleged fraud in the Barnum acquisition.

January 29, 1979, plaintiff Martinson filed this action against defendant Seery. Condensed, the petition alleged defendant so negligently planned and structured the Barnum acquisition as to foreclose use of its NOLS, and that he failed to so inform plaintiff's officers and directors and failed to investigate alternative methods that might have preserved the NOLS. At bottom, plaintiff's petition was based on the assumption that the Barnum transaction sustained an avoidable but fatal fallout from Internal Revenue Code section 334(b)(2). The interpretation of that section, however, became the litigated issue in the trial. Both parties produced well-qualified tax experts, attorneys whose opinions supported totally different interpretations of this section.

When plaintiff rested and again at close of all the evidence, defendant moved for directed verdict on the ground plaintiff had failed to prove the material allegations of its petition. This ground was reasserted in defendant's resistance to plaintiff's motion for new trial, and motion for judgment notwithstanding the verdict, where defendant contended "the testimony of the respective expert witnesses for the parties established conclusively that the matter of the interpretation of Section 334(b)(2) was a matter of judgment as to which a reasonable doubt would be entertained by well-informed lawyers."

Appealing, plaintiff asserts trial court erred in permitting the jury to determine the proper interpretation of Internal Revenue Code section 334(b)(2), in excluding certain documentary evidence, in admitting and excluding certain testimony, in limiting the applicability of the loss carry-over provisions to five years, and in failing to in-

---

**1.** Qualified tax experts at trial agreed that for this purpose the fair market value of assets, as opposed to book value, could be utilized.

struct the jury relating to certain claimed damages.

Defendant here contends the interpretation of the Internal Revenue Code provision was tried as a fact issue, and that any error in the submission of the applicability of the provision was harmless because the jury correctly applied defendant's interpretation. Finally, defendant asserts the evidence conclusively established the application of the provision was a matter over which reasonable doubt would be entertained by well-informed lawyers and the trial court was obligated to so rule as a matter of law.

We are convinced defendant's last contention is well taken. This obviates the necessity of reviewing all of the plaintiff's allegations of error.

### I. Applicable Legal Principles.

■ Legal malpractice consists of the failure of an attorney to use such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the task which they undertake. *See Millwright v. Romer*, 322 N.W.2d 30, 32 (Iowa 1982); *Kurtenbach v. TeKippe*, 260 N.W.2d 53, 56 (Iowa 1977).

■ In professional malpractice cases the law does not impose an implied guaranty of results. *Sinkey v. Surgical Associates*, 186 N.W.2d 658, 660 (Iowa 1971); *Grosjean v. Spencer*, 258 Iowa 685, 691–92, 140 N.W.2d 139, 143 (1966); *Wilson v. Corbin*, 241 Iowa 593, 599, 41 N.W.2d 702, 705 (1950). Moreover:

> If an attorney acts in good faith and in an honest belief that his acts and advice are well founded and in the best interest of his client, he is not held liable for a mere error of judgment. A fortiori, an attorney is not liable for an error in judgment on points of new occurrence or of nice or doubtful construction, or for a mistaken opinion on a point of law that has not been settled by a court of last resort and on which reasonable doubt may well be entertained by informed lawyers.

7 Am.Jur.2d *Attorneys at Law* § 201 (1980); *accord Woodruff v. Tomlin*, 616 F.2d 924, 932 (6th Cir.), *cert. denied*, 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980); *Baker v. Beal*, 225 N.W.2d 106, 112 (Iowa 1975); *Meagher v. Kavli*, 256 Minn. 54, 60–61, 97 N.W.2d 370, 375 (1959); *Hodges v. Carter*, 239 N.C. 517, 520, 80 S.E.2d 144, 146 (1954); *Denzer v. Rouse*, 48 Wis.2d 528, 534, 180 N.W.2d 521, 525 (1970); 7A C.J.S. *Attorney & Client* § 257 (1980).

Appellate courts generally have supported trial courts that, upon the required degree of proof, have applied the above principle in ruling the attorney free from liability as a matter of law. *See, e.g., Martin v. Burns*, 102 Ariz. 341, 343, 429 P.2d 660, 662 (1967); *Davis v. Damrell*, 119 Cal.App.3d 883, 887–89, 174 Cal.Rptr. 257, 259–61 (1981); *Hopper v. Gurtman*, 17 N.J.Misc. 289, 296, 8 A.2d 376, 380 (1939), *aff'd*, 126 N.J.L. 263, 18 A.2d 245 (1941); *Rosner v. Paley*, 116 Misc.2d 454, 465, 455 N.Y.S.2d 959, 965–66 (1982); *Quality Inns Intl., Inc. v. Booth, Fish, Simpson, Harrison and Hall*, 58 N.C.App. 1, 13–14, 292 S.E.2d 755, 763 (1982); *Collins v. Wanner*, 382 P.2d 105, 109 (Okla.1963); *Medrano v. Miller*, 608 S.W.2d 781, 784 (Tex.Civ.App. 1980).

### II. The Internal Revenue Code Section 334(b)(2) Issue.

As indicated in the above factual recital, plaintiff corporation sought to acquire and merge with Barnum under circumstances that would permit it to succeed to the latter's net operating loss carry-overs. *See* I.R.C. § 381. Internal Revenue Code section 381(a)(1), however, specifically *denies* carry-over of a liquidated subsidiary's tax attributes to the acquiring corporation when the latter has acquired the subsidiary in a manner bringing it within the provisions of Internal Revenue Code section 334(b)(2). The fighting in this trial focused on the latter provision of the federal law.

Internal Revenue Code section 334(b)(2) represented [2] the statutory codification of the so-called "Kimbell-Diamond" rule, see 14 T.C. 74, *aff'd*, 187 F.2d 718 (5th Cir. 1950), *cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951). By following its provisions, the continuing corporation is entitled to a "stepped up" basis in the assets received, equal to its adjusted basis in the capital stock of the subsidiary corporation. "In keeping with the theory that a § 334(b)(2) transaction is in substance a purchase of the assets, the acquiring corporation does not inherit the liquidating corporation's earnings and profits or other tax attributes, as it would in a 'normal' liquidation of a subsidiary by its parent." B. Bittker and J. Eustice, *Federal Income Taxation of Corporations and Shareholders* § 11.44 (4th ed. 1979).

Both parties concede that Martinson was required to fall without, or "flunk" the section 334(b)(2) requirements in order to utilize Barnum's NOLS. This requires us to consider the provisions of that section.

As adopted in the 1954 revenue act, section 334(b)(2) provided:

EXCEPTION.—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

(A) the distribution is pursuant to a plan of liquidation adopted—

(i) on or after June 22, 1954, and

(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction); and

(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by pur-

chase (as defined in paragraph (3)) <u>during a period of not more than 12 months,</u>

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made.

Internal Revenue Code of 1954, ch. 736, § 334(b)(2), 68A Stat. 105 (1954) (emphasis added).

In 1966 Congress sought to permit an acquiring corporation to obtain 80 percent of the stock in a target corporation by purchasing a controlling interest in a third corporation owning stock in the target corporation, while avoiding the effect of the Internal Revenue Code section 318 attribution rules. In amending section 334(b)(2) to effect this result, the underlined language in the above-quoted portion of the statute was deleted from subparagraph (B) and the following was substituted:

[D]uring a 12-month period beginning with the earlier of—

(i) <u>the date of the first acquisition by purchase of such stock,</u> or

(ii) if any such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made,

Foreign Investors Tax Act, Pub.L. No. 89–809, § 202(b), 80 Stat. 1539, 1576 (1966) (emphasis added).

It seems apparent that only subparagraph B(ii) involves acquisition of shares in a corporation owning stock in the target corporation. Subsection B(i), on the other hand, refers to the direct purchase of stock in the target corporation, and it is this provision that riveted the attention of these litigants. Plaintiff contended that "such stock" referred to the stock comprising the 80 percent control block required by section

---

**2.** It has since been repealed by the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324 (1982). Much of the

same concept, however, is retained in present Internal Revenue Code section 338.

334(b)(2)(B); thus Martinson's one-shot purchase of 80 percent of Barnum's stock put it squarely *within* section 334(b)(2), and consequently, Barnum's NOLS were lost. Defendant contended "such stock" referred to any stock purchased in the target corporation. In this case, therefore, implementation of the Barnum acquisition plan would fall outside the parameters of section 334(b)(2) because Martinson acquired its initial Barnum shares in September 1975, some thirteen months before its final purchase in October 1976.

Moreover, each party provided competent tax experts to support its statutory interpretation. Plaintiff called as witnesses two tax specialists, one of whom had a prior involvement in plaintiff's tax problems and had advised against attempting to claim the NOLS on Martinson's tax returns.

A silent witness for defendant was Williams, who died in June 1976. According to plaintiff's witnesses Williams was an outstanding tax attorney who wrote the tax aspects of the acquisition plan. That plan, presented to Martinson's directors on March 4, 1976, recited the purchase of the Barnum shares in September 1975, and proposed the further acquisition of the 80 percent owned by the Iowa investors by a 40 percent purchase upon approval of the plan and "the remaining one-half ... in October or November, 1976." Clearly, Williams believed the 1975 Barnum stock purchase launched the subsection 334(b)(2)(B)(i) "first acquisition by purchase," and the final purchase thirteen months later would avoid NOL forfeiture. Defendant produced another expert tax attorney who presented persuasive testimony for defendant's interpretation, and of course this position was supported by defendant. One of plaintiff's certified public accountants testified he saw nothing wrong with the manner in which the stock was acquired.

Neither litigant could produce any case authority on the point in issue, nor has our research disclosed a helpful decision. Plaintiff claims support in Treasury Regulation 1.334–1(c) and Prentice-Hall 1968 *Tax Handbook* § 3316. Neither source, however, directly addresses the issue litigated in this case, and neither ties that issue to the 1966 change in the statutory language. Both concentrate on the *final* date of a series of stock purchases totaling at least 80 percent of the subsidiary, to determine the start of the two-year period during which the acquiring corporation is required by the statute to liquidate the acquired corporation. Neither source addresses the new language that, for the first time, appeared to fix a *beginning* date for the twelve-month period within which the required 80 percent of the subsidiary's stock must be acquired.

After overruling defendant's motions for directed verdict, trial court, over the objections of both parties, left the matter to the jury's determination in the following instruction:

> Where one corporation acquires another by purchase, various sections of the Internal Revenue Code permit the acquiring corporation (in this case Plaintiff Martinson) to take advantage of the acquired corporation's (Barnum) net operating loss carry-forward if certain conditions are met. One of these conditions is that 80 percent or more of the acquired corporation's stock must be acquired in a certain period.
>
> It is for you to determine from the evidence in this case whether or not the 80 percent of stock in Barnum was properly acquired.

Both parties assert this was error, and each contends trial court should have instructed the jury the respective party's interpretation was the correct one.

In affirming, the court of appeals reasoned the defendant's verdict necessarily implied the jury found the acquisition of Barnum stock was structured so as not to come within the provisions of section 334(b)(2); thus its finding there was no malpractice in the Barnum acquisition. Because the court of appeals also found defendant's interpretation of that section to be correct, it held that allowing the jury to interpret the statute did not constitute reversible error.

The first premise for the court of appeals decision does not allow for the possibility that the jury may have found for defendant on other grounds, including his defense that he was employed only to carry out an acquisition plan devised by Williams. It is not necessary to reach the second premise, in our view, because defendant's fallback position is well taken: The error, if any, was harmless because trial court should have directed a verdict for him. There was not substantial evidence in the record to justify submission of the case to the jury where, as here, the evidence was so strong as to show as a matter of law that the interpretation of section 334(b)(2) was a question on which reasonable doubt could be entertained by well-informed lawyers. We believe the authorities cited in division I fully support this holding.

### III. *Other Issues.*

We have examined with care the other issues raised by plaintiff to determine whether they would affect our above determination. Most involve questions of damages. Those issues, of course, are mooted by our ruling that defendant was entitled to a directed verdict on the liability issue. The evidentiary issues would not affect the outcome, and in any event we view them to be without merit.

For the reasons stated above, trial court's judgment for defendant, and the court of appeals decision, are affirmed.

DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.

All Justices concur except CARTER, J., who concurs specially.

CARTER, Justice (concurring specially).

I concur in the result but for reasons different from those of the majority.

The issue of federal law presented in the present litigation is not a legal issue for the court but an issue of operative fact to be determined by the trier of fact. This is nonetheless so because the trier of fact is a jury. Juries should be permitted to determine issues of operative fact involving law in the same manner as issues involving medicine or other scientific data, *i.e.*, by expert testimony in the case.

It is not the role of the judge in such cases, either in trial or on appeal, to conduct independent legal research on the issue of operative fact. The judge's role is simply to determine whether there is sufficient conflict in the relevant and material evidence to present a jury issue. The evidence in the present case concerning this issue of operative fact was conflicting, and the district court did not err in submitting the case to the jury.