WATKISS & SAPERSTEIN, a Utah professional corporation, formerly Watkiss & Campbell, and Robert S. Campbell, Jr., Plaintiffs, Counterclaim Defendants, and Appellees,

v.

David R. WILLIAMS, an individual, Deanna Williams, an individual, and Intermountain Broadcasting, Inc., a Utah corporation, Defendants, Counter claimants, and Appellants.

No. 940294.

Supreme Court of Utah.

Nov. 26, 1996.

Rehearing Denied Feb. 25, 1997.

dants' counterclaim, which is at issue in this appeal, the trial court held as a matter of law that Watkiss & Campbell was not liable for the dismissal of defendants' complaint in the District of Columbia since that dismissal was based upon a significant change in the law effectuated by a case decided in that jurisdiction *after* Watkiss & Campbell had filed the complaint. In addition, the trial court held that the Williamses had no standing as individuals to assert malpractice claims against plaintiffs because the only injury they alleged was to their corporation, Intermountain Broadcasting, Inc. We affirm.

Glenn C. Hanni, Stuart H. Schultz, Salt Lake City, and Jacob A. Stein, Washington, DC, for plaintiffs.

R. Paul Van Dam, Glen D. Watkins, Bruce Wycoff, Salt Lake City, for defendants.

RUSSON, Justice:

Defendants David and Deanna Williams and Intermountain Broadcasting, Inc. (Intermountain), appeal from judgments dismissing their legal malpractice counterclaims against plaintiffs Watkiss & Saperstein (formerly Watkiss & Campbell) and Robert S. Campbell, Jr. (collectively, Watkiss & Campbell). Watkiss & Campbell had represented defendants in preparing and filing a legal malpractice complaint against their District of Columbia lawyers in the United States District Court for the District of Columbia. However, the complaint was dismissed by that court on the ground that the claims were time-barred by the applicable statute of limitations.

Watkiss & Campbell subsequently filed an action in Utah against Intermountain and the Williamses, seeking unpaid attorney fees. Intermountain and the Williamses filed a counterclaim against Watkiss & Campbell for malpractice for failing to file their complaint in a timely manner. With respect to defen-

## I. BACKGROUND

David and Deanna Williams organized Intermountain Broadcasting, Inc., and were its sole shareholders.[1] In 1981, Intermountain learned that the Federal Communications Commission (FCC) was accepting applications for a license to construct and operate a television station in Salt Lake City, Utah. Intermountain decided to apply for the license and sought the assistance of Arent, Fox, Kinter, Plotkin & Kahn (Arent Fox), a District of Columbia law firm with experience in such matters. Intermountain's application included a commitment, or an "integration statement" in the vernacular of the FCC, by the Williamses as owners of Intermountain to devote full-time participation in the management of the station if awarded the broadcasting license. The FCC looked favorably on such commitments, and the inclusion of the statement in Intermountain's application would improve its chances of obtaining the license. The application, including the integration statement, was filed with the FCC on March 10, 1981.

In late 1982, while the FCC's review of applications for the television license was still pending, the Williamses learned that the FCC was also accepting applications for a license to operate a cellular radio facility in

---

1. Throughout this appeal, the Williamses assert that they acted, not on behalf of their corporation, Intermountain, but as individuals. The trial court, in dismissing the Williamses' individual claims, ruled that they did not act individually, but only as shareholders and, thus, on behalf of Intermountain. Our disposition of the other is- sues on appeal renders review of this ruling unnecessary inasmuch as the trial court's dismissal must be affirmed whether the Williamses acted individually or on behalf of Intermountain. Accordingly, we refer to Intermountain and the Williamses interchangeably.

Salt Lake City. Utah Telecourier, Inc. (UTI), another corporation of which the Williamses were the sole shareholders, decided to apply.

To assist them in pursuing the cellular radio license, UTI retained the District of Columbia law firm of Bloosten & Mordkofsky. Harold Mordkofsky and his firm had previously represented another corporation of which the Williamses were the sole shareholders, Industrial Communications, which provided common carrier mobile radio facilities licensed by the FCC.

Mordkofsky knew that UTI's application for the cellular radio license would be more likely to succeed if it too contained an integration statement. However, Mordkofsky also knew of Intermountain's television application and the Williamses' commitment therein to devote their full attention to the management of the proposed television station and that the Williamses intended to divest themselves of the cellular radio business if the television license was granted. Nevertheless, on its own initiative, Bloosten & Mordkofsky included in UTI's application the Williamses' commitment to participate on a full-time basis in the management of the proposed cellular radio facility if awarded the cellular radio license.

Upon seeing the drafted application, the Williamses expressed concern about the apparent conflict between their fulltime commitment included in the cellular radio application and their full-time commitment in the television application. To allay their fears, Mordkofsky informed them that different divisions of the FCC review television and cellular radio applications and that if the FCC granted the television license, UTI could withdraw the cellular radio license. Assured by Mordkofsky's response, UTI submitted its application to the FCC.

Despite Mordkofsky's assurances, Mr. Williams was subsequently compelled to admit to the FCC the conflict between the applications. In August 1984, during a hearing before an FCC administrative law judge, Mr. Williams testified in support of Intermountain's television application. After Mr. Williams repeated his commitment to participate on a full-time basis in the station's management, a competing applicant cross-examined him about the conflicting UTI integration statement. Mr. Williams replied that he always intended the television application's commitment to have priority over the statements in the other application. That evening, Arent Fox attorneys told the Williamses that due to the exposed conflicting integration statement in the UTI application, Intermountain's television application was in "deep trouble" unless the conflict could be explained. The Williamses replied that the conflict was due to Mordkofsky's advice and that in view of their long-standing relationship with Mordkofsky, Mordkofsky would not mind explaining that he and his law firm were responsible for the inconsistency.

On November 5, 1984, the administrative law judge scheduled an additional hearing to determine whether Mr. Williams misrepresented himself or lacked candor in submitting conflicting integration statements. Arent Fox had performed additional legal work to prepare for these proceedings, for which it billed Intermountain a total of $7,235. The billing statements sent to Intermountain clearly designated the work performed as necessary to overcome the setback caused by the exposed UTI cellular radio application.

One of the Arent Fox attorneys met with Mordkofsky to determine whether he could testify during the FCC proceedings to counteract the conflict between the television and the cellular radio applications. Although Mordkofsky initially indicated that he knew nothing about the television application, he later indicated that he would testify in an attempt to resolve the inconsistency.

However, prior to the hearing in which he was to testify, Mordkofsky submitted a written statement to the FCC that failed to state that his law firm, on its own initiative, had inserted the conflicting integration statement into UTI's application. And at the hearing on January 7, 1985, Mordkofsky again declined to admit that the conflict between the television and the cellular radio applications was of his own making. Mordkofsky's testimony all but confirmed the allegations of Mr. Williams's lack of candor and misrepresenta-

tion. On May 20, 1985, the administrative law judge issued an opinion denying Intermountain's application. The judge refused to give Intermountain credit for its integration statement and assessed a demerit for lack of candor.

Intermountain appealed the decision to an FCC review board. Intermountain again beseeched Mordkofsky to explain his inclusion of the integration statement. He refused, and on December 10, 1985, the review board denied Intermountain's appeal. Intermountain initially sought further review but later withdrew its appeal in exchange for a $1 million settlement from a competing applicant who was ultimately awarded the broadcasting license.

In September 1986, following the settlement and the dismissal of Intermountain's appeal, the law firm of Watkiss & Campbell was retained to bring a malpractice action against Bloosten & Mordkofsky in a District of Columbia court. Because the Williamses expressed concern about the running of the applicable statutory limitation period for the malpractice suit, Watkiss & Campbell researched District of Columbia case law and determined that the statute of limitations for legal malpractice actions was three years, running from the date of injury rather than the date of the actionable advice. It further determined that Intermountain's injury occurred on May 20, 1985, the day the administrative law judge denied it a television broadcasting license worth $15 million. Hence, the attorneys concluded, Intermountain's complaint need only be filed by May 20, 1988.

The Williamses continued to express concern to Watkiss & Campbell that the time to file their malpractice claims might be expiring. During the spring of 1987, Watkiss & Campbell again reviewed the statute of limitations issues. It decided, as a precautionary measure, to file the complaint earlier than planned on the possibility that a court could find that the claims accrued on January 7, 1985, when Mordkofsky testified unfavorably before the FCC administrative law judge, instead of when the application for the television broadcasting license was denied on May 20, 1985. Accordingly, Watkiss & Campbell filed the complaint against Bloosten & Mord-

kofsky in the United States District Court for the District of Columbia on January 7, 1988, exactly three years from the date of Mordkofsky's unfavorable testimony. In its complaint, Intermountain sought compensation for the loss of the broadcasting license, which was valued at $15 million.

On December 29, 1988, Bloosten & Mordkofsky moved for summary judgment and the dismissal of the malpractice claims on the ground that the claims were time-barred. While the motion was pending, the District of Columbia Court of Appeals, on February 6, 1989, issued its decision in *Knight v. Furlow*, 553 A.2d 1232 (D.C.1989).

In *Knight*, attorney Furlow had drafted a will for the plaintiff's father whereby the primary beneficiary was the plaintiff, Knight. *Id.* at 1232. However, following the father's death, the will was contested in a Florida court and, on May 6, 1983, was invalidated on the ground that Knight had exercised undue influence over his father. *Id.* at 1232–33. Knight appealed the invalidation to a Florida Court of Appeals, which affirmed the lower court's ruling on April 18, 1984. *Id.* at 1233. Nearly three years later, on April 17, 1987, Knight filed suit against Furlow in the District of Columbia, alleging legal malpractice. *Id.* Upon Furlow's motion, the trial court dismissed the complaint as time-barred by the three-year statute of limitations. *Id.* On appeal, the District of Columbia Court of Appeals affirmed, holding that prior to May 6, 1983, when Knight incurred attorney fees and court costs in an attempt to preserve the validity of the will and ameliorate Furlow's alleged negligence, Knight suffered injury from Furlow's malpractice, and the statute of limitations commenced running. *Id.* at 1235–36. Since Knight's complaint was filed over three years from the time he incurred those legal fees, his claims were time-barred. *Id.* at 1236.

Relying on *Knight*, the District of Columbia trial court in *Mordkofsky* ruled that Intermountain suffered injury from Bloosten & Mordkofsky's malpractice in November 1984, when it incurred $7,235 in legal fees to overcome the damage caused by Bloosten & Mordkofsky's inclusion of the integration statement in UTI's cellular radio application.

Accordingly, the trial court held that the malpractice claims in the complaint accrued at that time and were time-barred as of November 1987. Because Intermountain's complaint was filed after this time, the trial court dismissed four of the five claims asserted in the complaint.[2] Subsequently, the United States Court of Appeals for the District of Columbia Circuit affirmed the trial court's ruling. *Williams v. Mordkofsky,* 901 F.2d 158 (D.C.Cir.1990).

The instant case was commenced on June 19, 1990, when Watkiss & Saperstein (formerly Watkiss & Campbell) filed a complaint in Utah district court against Intermountain and the Williamses, seeking unpaid legal fees. Intermountain and the Williamses answered and counterclaimed, alleging that Watkiss & Campbell committed negligence and breached its implied contract by failing to consider the incurring of $7,235 in attorney fees as a statute of limitation-triggering event in the *Mordkofsky* case.

The counterclaims were dismissed in two stages. First, on October 16, 1991, the trial court entered partial summary judgment, dismissing the Williamses' claims of negligence and breach of contract on the ground that the Williamses failed to demonstrate how they, as individuals, were injured. The only damage they suffered as a result of Bloosten & Mordkofsky's alleged malpractice, according to Mr. Williams's deposition testimony taken in connection with the Bloosten & Mordkofsky lawsuit, was a diminution in the value of their stock in Intermountain. In addition, the only relief ever requested by the Williamses against Bloosten & Mordkofsky was compensatory damages in the amount of $15 million, the alleged value of the lost television broadcasting license. On the basis of these facts, the trial court ruled that the Williamses were not entitled to pursue personal causes of action because the only alleged damage was to Intermountain. Thus, following the trial court's October ruling, Intermountain was the sole remaining counterclaimant against Watkiss & Campbell.

As to Intermountain's counterclaims, the trial court bifurcated the case and scheduled an initial bench trial to determine the status of District of Columbia law regarding the statute of limitations at the time Watkiss & Campbell filed its complaint. The only issues to be tried were the status of the law on January 7, 1988, the date on which the complaint against Bloosten & Mordkofsky was filed, and whether *Knight,* decided after that date, changed that law. The trial court ruled that Watkiss & Campbell was subject to the law of the District of Columbia as it existed at the time the complaint was filed and that the attorneys "ha[d] no duty to predict and/or anticipate changes, modifications, or clarifications of existing law." The trial court also ruled that the status of the law in the District of Columbia and *Knight*'s effect on that law were questions of law for the court.

In determining the status of the law in the District of Columbia, the trial court reviewed and considered statutory and case law from that jurisdiction. The cases included *Byers v. Burleson,* 713 F.2d 856 (D.C.Cir.1983), *Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111 (D.C.Cir.1982), *Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson,* 381 F.2d 261 (D.C.Cir.1967), *Hunt v. Bittman,* 482 F.Supp. 1017 (D.D.C.1980), *aff'd,* 652 F.2d 196 (D.C.Cir.1981), *Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192 (D.C.1984), and *Weisberg v. Williams, Connolly & Califano,* 390 A.2d 992 (D.C.1978).

In addition, the trial court heard the testimony of legal experts from the District of Columbia who were familiar with statute of limitations law in that jurisdiction. These experts were not called to testify concerning any factual issues, for there were none, but were called more in an advisory capacity. In the trial court's own words:

> The purpose of the hearing was *not* to evaluate the testimony of the expert witnesses and decide which witnesses were most credible and adopt that analysis, but rather this Court deemed the purpose more akin to what a judge or justice of a state or federal appellate court might have

---

**2.** The fifth claim, labeled "intentional breach of duty and conflict of interest," was dismissed on

the merits. *Williams v. Mordkofsky,* 901 F.2d 158, 159 (D.C.Cir.1990).

available in researching such decisions, through the resources of law clerks.

The four legal experts testified regarding the status of District of Columbia law concerning *Knight* and *Knight*'s effect on the law. Three of the experts were called by Watkiss & Campbell and testified that *Knight* represented a complete philosophical change in the trend set by pre-*Knight* cases. One of Watkiss & Campbell's experts, a professor of law at Georgetown University, testified:

> The proposition being put forward that [minimal] attorney's fees could trigger the statute [of limitations] is saying that any damage as long as it's concrete triggers the statute. That means if you sent a postcard to your lawyer and say I think there might have been malpractice here and put a 25–cent stamp on it, that would be your injury triggering the statute of limitations. Or if you take a cab to your lawyer, that is to me preposterous. And a person could not foresee against the background of these District of Columbia cases that the Court would ever take that position.

Even Intermountain's sole expert testified, "I said, and I stand by the deposition testimony, that May 20, 1985 [the date on which the television application was denied] would have been in my view the most likely of the several dates a court could pick for saying that's when the injury occurred."

Following the trial, the trial court determined that at the time Watkiss & Campbell filed Intermountain's complaint against Bloosten & Mordkofsky,

> the statute of limitations for legal malpractice commenced to run [when] the professional negligence result[ed] in a significant injury or loss (such as an adverse decision on an FCC license application). The incurral [sic] of modest attorney's fees to review the matter, even before the significant loss occurred, [was] not significant under pre-*Knight* case law to trigger the running of the statute of limitations.

Therefore, the trial court held, "the decision of *Knight v. Furlow* constituted a substantial and significant change in the District of Columbia law on that issue." The trial court

concluded that "a lawyer in properly representing a client is not required to anticipate" such a change.

Subsequently, Watkiss & Campbell moved for entry of judgment in accord with the trial court's decision. The trial court granted the motion, dismissed all remaining counterclaims against Watkiss & Campbell, and certified its judgments, including the dismissal of the Williamses' counterclaims, as final judgments under rule 54(b) of the Utah Rules of Civil Procedure. The judgment of dismissal stated that before *Knight*, a significant injury was required to trigger the statute of limitations and the first such injury to Intermountain occurred on May 20, 1985, the day its application was denied. Moreover, the trial court stated, the complaint against Bloosten & Mordkofsky was dismissed as time-barred only because of the change brought about by *Knight*, which Watkiss & Campbell had no duty to predict or anticipate. Intermountain and the Williamses appealed.

On appeal, Intermountain and the Williamses argue that (1) the trial court erred as a matter of law in concluding that *Knight* changed District of Columbia law; (2) even if the trial court correctly ruled that pre-*Knight* District of Columbia law required a significant injury to trigger the statute of limitations, the trial court erred in refusing to allow a jury to decide (a) whether Watkiss & Campbell was nonetheless negligent in failing to undertake reasonable research necessary to make an informed judgment as to when the statute of limitations commenced running, (b) whether a significant injury occurred prior to the injury selected by Watkiss & Campbell, (c) whether Watkiss & Campbell acted reasonably in waiting sixteen months from the time it was retained until the time it filed Intermountain's complaint, or (d) whether Watkiss & Campbell reasonably neglected to advise Intermountain of the risks inherent in waiting to file the complaint; and (3) whether the trial court erred in ruling that the Williamses had no standing as individuals to maintain their counterclaims against Watkiss & Campbell.

Watkiss & Campbell respond that (1) the trial court correctly ruled that District of Columbia law had changed between the time Watkiss & Campbell filed Intermountain's complaint and the time the complaint was dismissed as time-barred; (2) the trial court correctly dismissed Intermountain's attempts to create issues of fact to preclude judgment as a matter of law; and (3) the trial court correctly dismissed the Williamses' counterclaims because the Williamses failed to allege any cognizable injury to themselves as a result of Watkiss & Campbell's alleged malpractice.

## II. ANALYSIS

■ To sustain a claim of legal malpractice, a plaintiff must show (1) the existence of an attorney-client relationship, (2) the existence of a duty on the part of the lawyer, (3) the failure to perform that duty, and (4) that the negligence of the lawyer was the proximate cause of the damage to the client. *Williams v. Barber,* 765 P.2d 887, 889 (Utah 1988) (plurality) (Howe, J.). An attorney has a duty " 'to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.' " *Id.* (quoting *Lucas v. Hamm,* 56 Cal.2d 583, 15 Cal.Rptr. 821, 825, 364 P.2d 685, 689 (1961)). Moreover, an attorney engaged in litigation must be conversant with the procedural and substantive rules that govern the litigation of the action. *See Hipwell v. Sharp,* 858 P.2d 987, 989 (Utah 1993).

■ Where the attorney is charged with an error regarding applicable law, a plaintiff must show that the attorney erred in regard to that law and, if such an error is shown, that the error was due to the attorney's negligence. *See* 2 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 17.7, at 509–13 (4th ed.1996). The applicable law is the law in the relevant jurisdiction that existed at the time the attorney's services were rendered. As we stated in *Hipwell,* a legal malpractice case, "It is well settled that an evaluation of the reasonableness of an attorney's services must be based on the law as it existed at the time such services were rendered." 858 P.2d at 989. In other words,

"[a]n attorney need not be clairvoyant and foresee future changes in the law." *Vande Kop v. McGill,* 528 N.W.2d 609, 613 (Iowa 1995); *see Ruchti v. Goldfein,* 113 Cal.App.3d 928, 170 Cal.Rptr. 375, 378 (1980); *Stake v. Harlan,* 529 So.2d 1183, 1185 (Fla.Dist.Ct. App.1988); *Procanik v. Cillo,* 226 N.J.Super. 132, 543 A.2d 985, 994 (App.Div.1988).

If the plaintiff successfully shows that his attorney erred under applicable law, it is well recognized that the attorney may still avoid liability by showing that his error was the result of an uncertain, unsettled, or debatable state of the applicable law. *See Cianbro Corp. v. Jeffcoat & Martin,* 804 F.Supp. 784, 789 (D.S.C.1992), *aff'd,* 10 F.3d 806 (4th Cir. 1993); *Smith v. Lewis,* 13 Cal.3d 349, 118 Cal.Rptr. 621, 627, 530 P.2d 589, 595 (1975), *overruled on other grounds, In re Marriage of Brown,* 15 Cal.3d 838, 126 Cal.Rptr. 633, 641 n. 14, 544 P.2d 561, 569 n. 14 (1976); *Meir v. Kirk, Pinkerton, McClelland, Savary & Carr,* 561 So.2d 399, 402 (Fla.Dist.Ct.App. 1990); *Jones, Day, Reavis & Pogue v. American Envirecycle, Inc.,* 217 Ga.App. 80, 456 S.E.2d 264, 267 (1995); *Lewis v. Desmond,* 187 A.D.2d 797, 589 N.Y.S.2d 678, 679 (1992); *Quality Inns Int'l Inc. v. Booth, Fish, Simpson, Harrison & Hall,* 58 N.C.App. 1, 292 S.E.2d 755, 762 (1982); *Howard v. Sweeney,* 27 Ohio App.3d 41, 499 N.E.2d 383, 386 (1985).

Most courts hold that the issues of whether the lawyer erred and whether the error was caused by vagaries in the law raise questions of law to be decided by the court. *See Hanlin v. Mitchelson,* 623 F.Supp. 452, 456–57 (S.D.N.Y.1985), *aff'd,* 794 F.2d 834 (2d Cir.1986); *Martin v. Burns,* 102 Ariz. 341, 429 P.2d 660, 662 (1967); *Davis v. Damrell,* 119 Cal.App.3d 883, 174 Cal.Rptr. 257, 259–60 (1981); *Allred v. Rabon,* 572 P.2d 979, 981 (Okla.1977); *Copeland Lumber Yards, Inc. v. Kincaid,* 69 Or.App. 35, 684 P.2d 13, 14 (1984); Mallen & Smith at § 17.7; *accord Hipwell,* 858 P.2d at 988–90.

■ On appeal, we apply the same standards. Because the question of whether an attorney made an erroneous legal interpretation is a question of law, we will afford the trial court's decision no deference but review

it for correctness. *See Ong Int'l (U.S.A.), Inc. v. 11th Ave. Corp.,* 850 P.2d 447, 452 (Utah 1993).

■ The trial court determined that at the time Watkiss & Campbell filed Intermountain's complaint, the applicable statute of limitations in the District of Columbia commenced running when the malpractice caused "a significant or major injury" and that the assessment of attorney fees incurred to cure the negligent attorney's harmful acts did not qualify as an injury under the rule. Thus, the trial court determined that under relevant District of Columbia case law, Watkiss & Campbell did not err. An examination of this case law reveals that the trial court's interpretation is sound.

■ For many years, District of Columbia courts had applied the "injury rule" to determine when the statute of limitations commenced running on legal malpractice actions. *See Fort Myers Seafood Packers, Inc. v. Steptoe & Johnson,* 381 F.2d 261, 262 (D.C.Cir.1967). "Under this rule, a claim for legal malpractice accrues when plaintiff-client suffers *actual* injury, *not* when the act causing the injury occurs." *Byers v. Burleson,* 713 F.2d 856, 859–60 (D.C.Cir.1983); *see also Hunt v. Bittman,* 482 F.Supp. 1017, 1020–21 (D.D.C.1980), *aff'd,* 652 F.2d 196 (D.C.Cir.1981); *Weisberg v. Williams, Connolly & Califano,* 390 A.2d 992, 994–95 (D.C. 1978).

Also, the District of Columbia courts had adopted the "discovery rule" in certain cases. *Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111, 116 (D.C.Cir.1982). Under the discovery rule, the " 'cause of action accrues when the plaintiff knows or through the exercise of due diligence should have known of the injury.' " *Id.* (quoting *Burns v. Bell,* 409 A.2d 614, 617 (D.C.1979)). The rule had been applied "to redress situations in which the fact of injury was not readily apparent and indeed might not become apparent for

several years after the incident causing injury had occurred." *Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192, 1201 (D.C.1984). In fact, the discovery rule had been approved for legal malpractice cases by the District of Columbia Court of Appeals and federal courts in that jurisdiction since 1983. *See id.*

Under either the injury rule or the discovery rule as applied by District of Columbia courts prior to *Knight v. Furlow,* 553 A.2d 1232 (D.C.1989), a court would not have held that the statute of limitations for Intermountain's claims against Bloosten & Mordkofsky was triggered by the incurring of $7,235 in attorney fees rather than when Intermountain's application for a television license was denied. No District of Columbia case even intimated that the incurring of legal fees rather than some later, more significant injury could constitute a triggering event. Indeed, the *Knight* decision did not cite, nor could it have cited, any prior District of Columbia case in holding that the incurring of attorney fees could trigger the statute of limitations.

In pinpointing an accrual date for a legal malpractice claim under the statute of limitations, the District of Columbia courts prior to *Knight* selected dates of relatively substantial injuries.[3] The courts in *Fort Myers Seafood Packers* and *Hunt,* disregarded relatively insignificant trigger dates and selected dates of more substantial injuries.

In *Fort Myers Seafood Packers,* the case credited with adopting the injury rule in the District of Columbia, the court had to determine when the plaintiff fishing boat owners were injured by their attorney's negligent advice for statute of limitations purposes. In 1962, the defendant-attorney prepared a contract for the boat owners under which the owners would send their boats to Venezuelan waters to fish and the harvested fish would be processed and sold to the other contracting party. 381 F.2d at 262. The contract stated, "Neither the laws of Venezuela nor

---

**3.** In two of the four pre-*Knight* legal malpractice cases, the District of Columbia court refused to determine the exact date upon which the statute of limitations commenced running. *See, e.g., Weisberg v. Williams, Connolly & Califano,* 390 A.2d 992, 995 (D.C.1978) (finding it unnecessary to pinpoint exact date as trigger for the statute of

limitations because "it is clear that neither of the ... dates suggested by [plaintiffs] is acceptable because both are well beyond the point at which [plaintiffs] suffered injury" (footnote omitted)); *Byers v. Burleson,* 713 F.2d 856, 861 (D.C.Cir. 1983) (parties did not dispute date of injury; issue was as to when plaintiff *discovered* injury).

the provisions of this Contract require[ ] or contemplate[ ] any change in the present American registry of the boat(s)." *Id.* However, after executing the contract and sending their boats to Venezuelan waters, the boat owners learned that their American registry was illegal. On July 25, 1962, the boats were impounded. *Id.*

Three years later, on July 22, 1965, the boat owners sued the attorney, alleging legal malpractice. The trial court dismissed the claims as time-barred by the three-year statute of limitations. On appeal, the United States Court of Appeals for the District of Columbia Circuit reversed, holding that the owners' injury occurred when its boats were impounded. *Id.* The court refused to consider earlier dates, stating, "We think the suit was timely whether or not [the attorney's] advice had previously caused other damage." *Id.*

In *Hunt,* convicted Watergate conspirator E. Howard Hunt sued his attorneys for malpractice in connection with his convictions. The court had to determine if his claims were time-barred. In 1972, Hunt was arrested and indicted for conspiracy, burglary, and illegal interception of oral and wire communications. *Hunt,* 482 F.Supp. at 1018–19. On January 11, 1973, acting on his attorneys' advice, he pleaded guilty to all counts. On March 23, 1973, Hunt was provisionally sentenced to prison and immediately incarcerated. *Id.* at 1019. Subsequently, however, the Watergate special prosecutor indicated that there was possibly a conflict of interest between Hunt and his attorneys. Thereafter, Hunt, represented by new counsel, moved to withdraw his guilty plea and dismiss the indictment. The judge sentenced Hunt to thirty months to eight years in prison and fined him $10,000. *Id.* Hunt appealed the denial of his motion and was temporarily released from prison pending appeal. On February 25, 1975, however, a unanimous court of appeals affirmed the lower court's decision. Two months later, on April 25, 1975, Hunt returned to prison, where he remained until he was released on parole in February 1977.

On September 30, 1977, Hunt filed a civil lawsuit against his original attorneys, seek-

ing damages for his imprisonment, loss of reputation, loss of earnings, and distress. *Id.* at 1019. Hunt alleged that his attorneys wrongfully induced him to accept an unfavorable plea bargain and plead guilty to all charges against him. *Id.* at 1020 & n. 19. The attorneys moved for dismissal of the claims, arguing that the claims were barred by a three-year statute of limitations. The attorneys argued that Hunt was injured on either (1) January 11, 1973, the date on which he pleaded guilty; (2) March 23, 1973, the date on which Hunt was incarcerated following his provisional sentencing; or (3) November 9, 1973, the date on which Hunt received his final sentence. *Id.* at 1021. The court held that Hunt was injured on March 23, 1973, the day he was first sentenced and incarcerated, and therefore that his claims were time-barred. *Id.* at 1022.

Hunt's first injury arguably occurred on January 11, 1973, the day he pleaded guilty and thereby experienced the loss of reputation and distress incident to criminal convictions. In fact, Hunt sought compensation from the defendant-attorneys for the incidental distress and loss of his reputation occasioned on the day he pleaded guilty to all the counts in the indictment. *Id.* at 1019. Nevertheless, the court selected the date upon which Hunt was first sentenced and incarcerated, an injury of much greater magnitude.

In sum, in every pre-*Knight* legal malpractice case where the court pinpointed a date upon which the statute of limitations commenced running, the court selected the date upon which the plaintiff suffered significant harm. In doing so, the courts disregarded dates of less significant harm. Thus, at the time Watkiss & Campbell filed Intermountain's complaint, District of Columbia courts required a more significant injury than the mere incurring of modest attorney fees to trigger the statute of limitations.

At least one District of Columbia court clearly disfavored a rule that would mandate litigants to file a complaint upon the first showing of injury, no matter how insignificant. In *Wilson,* the court had to decide whether a three-year statute of limitations required a litigant to file a complaint upon the diagnosis of asbestosis and possibly fore-

go suit upon a later, more serious diagnosis of cancer—both of which were caused by exposure to the defendants' asbestos products. 684 F.2d at 119–20. The court declined to so rule, reasoning that it would cause harm to the public policy of allowing plaintiffs to obtain adequate compensation for latent diseases.

The traditional American rule, adopted in the District of Columbia, is that recovery of damages based on future consequences may be had only if such consequences are "reasonably certain." . . . .

In view of the "reasonably certain" standard, it appears that [under a rule triggering the statute of limitations upon the showing of asbestosis,] there can *never* be a recovery for cancer unless (1) a lawsuit is filed within three years of the asbestosis diagnosis, and (2) cancer becomes manifest during the course of that lawsuit. For it is altogether likely that had [the plaintiff], upon receiving the "mild asbestosis" diagnosis, sought to recover for a cancer which might (or might not) develop, [the defendant] would have argued forcibly that the probability of such a development was . . . too speculative, conjectural, uncertain to support a damage award.

*Id.* (footnotes omitted). In addition, the court explained, concerns for judicial economy militate against such a rule:

Upon diagnosis of an initial illness, such as asbestosis, the injured party may not need or desire judicial relief. Other sources, such as workers' compensation or private insurance, may provide adequate recompense for the initial ailment. If no further disease ensues, the injured party would have no cause to litigate. However, if such a person is told that another, more serious disease may manifest itself later on, and that a remedy in court will be barred unless an anticipatory action is filed currently, there will be a powerful incentive to go to court, for the consequence of a wait-and-see approach to the commencement of litigation may be too severe to risk. Moreover, a plaintiff's representative in such a case may be motivated to protract and delay once in court so that the full story of his client's condition will be known before the case is set for trial.

*Id.* at 120; *see also Ehrenhaft,* 483 A.2d at 1203 ("Finally, we point out that the interests of judicial economy militate in favor of application of the discovery rule. In cases like the one at bar, where the professional returns upon request to remedy damages resulting from defective work, to preclude application of the rule would likely serve to encourage litigation in the first instance, rather than as a last resort.").

These concerns are relevant to the question of whether the incurring of attorney fees triggers the District of Columbia statute of limitations on legal malpractice claims. A rule forcing clients to either file suit upon the incurring of attorney fees or else risk losing the opportunity to seek redress for subsequent, greater harms would threaten the public policy allowing plaintiffs to receive compensation for actionable losses. In addition, such a rule could force clients into court against their attorneys before the attorneys had the opportunity to cure their mistakes. Thus, District of Columbia case law prior to *Knight* required a greater injury than the mere incurring of modest attorney fees to trigger the statute of limitations for legal malpractice actions.

Intermountain argues that one District of Columbia court at least implied that the statute of limitations could be triggered by the incurring of attorney fees. In a footnote in *Byers,* the court referred to four treatises and articles "[f]or more detailed discussions of the injury rule and other rules developed to determine the time of accrual of plaintiff-client's cause of action for legal malpractice." 713 F.2d at 859–60 n. 5. In the first cited treatise, Ronald E. Mallen & Victor B. Levit, *Legal Malpractice* §§ 388–94 (2d ed.1981), the authors' discussion of the injury rule examined decisions holding that statutes of limitations were triggered by the incurring of attorney fees. *Id.* at § 390. In addition, three of the cited authorities maintained that under the injury rule, the statute of limitations is triggered upon the occurrence of any actual injury rather than a substantial injury. *See id.;* Note, *McClung v. Johnson: Limitations in Legal Malpractice Actions,*

34 Baylor L.Rev. 269, 274–75 (1982); Note, *Attorney Malpractice: Towards An Illinois Statute of Limitations,* 1982 U. Ill.L.Rev. 479, 487.

However, for three reasons, the citations within the *Byers* footnote do not signal the District of Columbia's adoption of the view that the incurring of attorney fees rather than a later, more significant harm commences the running of the statute of limitations. First, nothing in the *Byers* footnote reflects approval of the decisions or every proposition set forth in the cited treatises and articles. Indeed, most courts would be shocked to learn that in citing works for their general discussions, future courts in the jurisdiction would thereafter be bound by every proposition set forth therein.

Second, District of Columbia case law prevents the *Byers* footnote from having any binding effect. In the District of Columbia, language in an opinion which "constitute[s] obiter dictum, entirely unnecessary for the decision of the case . . . [has] no effect as indicating the law of the District." *Noel v. Olds,* 138 F.2d 581, 586 (D.C.Cir.1943); *see Ceco Corp. v. Coleman,* 441 A.2d 940, 953 (D.C.1982). The footnote in *Byers* citing authorities which discuss the injury rule was completely unnecessary for the decision. No party in *Byers* disputed when the plaintiff's first injury occurred. Rather, the discovery rule was applicable, and the parties debated when the plaintiff *discovered* her injury and thereby triggered the statute of limitations. *Byers,* 713 F.2d at 861–63. Any discussion or citation of works regarding the injury rule was therefore obiter dictum. Therefore, the *Byers* court's citations cannot indicate how a District of Columbia court would resolve the question of whether the incurring of attorney fees triggers the statute of limitations.

Third, the strength of the trend set by prior decisions requiring a substantial injury to trigger the statute of limitations belies the proposition that the *Byers* court's citation to these works for their general discussions signals an adoption of a different rule. Obiter dictum in the footnote of a single opinion cannot contradict the holdings of two courts selecting significant over lesser injuries. Nor can it contradict the opprobrium voiced by another court toward a rule requiring a plaintiff to file suit upon the occurrence of an insignificant harm but forego suit upon a later, more serious affliction. For these reasons, the *Byers* footnote does not indicate that District of Columbia law adopted the rule that the statute of limitations can be triggered by the incurring of attorney fees.

The inescapable conclusion is that before *Knight,* a District of Columbia court would have selected the loss of the $15 million television broadcasting license rather than the incurring of $7,235 in attorney fees as the injury to trigger the three-year statute of limitations. Under pre-*Knight* case law, the trigger date was May 20, 1985, the day Intermountain's application for the television broadcasting license was denied. This was the day Intermountain first suffered a significant injury. Thus, a court following the analyses of *Fort Myers Seafood Packers* and *Hunt* would have selected this date as the date on which Intermountain's claims against Bloosten & Mordkofsky accrued.

Moreover, selecting November 1984, the time Intermountain incurred $7,235 in attorney fees, as the trigger for the statute of limitations would contravene the public policies articulated in *Wilson.* The first public policy that would be harmed is the District of Columbia's policy to allow plaintiffs to obtain compensation for actionable losses. If Intermountain had attempted to sue Bloosten & Mordkofsky for the loss of the $15 million television broadcasting license when it incurred $7,235 in attorney fees, its claim for damages would have been speculative and would have failed the District of Columbia's "reasonably certain" predicate to recovery. *See Wilson,* 684 F.2d at 119–20. At that time, Intermountain did not know with any degree of certainty that its application was going to be denied. However, a rule triggering the statute of limitations upon the incurring of attorney fees would mean that Intermountain could never recover for the possible loss of the license unless it filed within the three-year statute of limitations period and the license was lost during that time. Hence, such a rule would violate the District of Columbia's public policy to allow

Intermountain to obtain recovery for the $15 million broadcasting license.

Also, such a rule would foster hasty litigation, contrary to the District of Columbia's public policy to conserve judicial resources. *See Wilson*, 684 F.2d at 120; *Ehrenhaft*, 483 A.2d at 1203. Upon the expenditure of sums to ameliorate the setback caused by the conflicting cellular radio application, Intermountain may have thought it did not need judicial relief. In fact, the Williamses believed that Mordkofsky's testimony could impress upon the FCC's administrative law judge that Bloosten & Mordkofsky rather than Intermountain was responsible for the conflicting integration statement in UTI's cellular radio application. However, a rule triggering the statute of limitations upon the incurring of attorney fees would have forced Intermountain into court for fear of losing the opportunity to obtain relief in the event that the testimony was not helpful. In doing so, Intermountain might have lost any hope of recruiting Mordkofsky to confess his responsibility for the inclusion of the integration statement in the UTI application. In addition, Intermountain's only hope of obtaining relief would then be through a malpractice action against Bloosten & Mordkofsky. Thus, a rule triggering the statute of limitations upon the incurring of attorney fees results in harm to public policies that District of Columbia courts sought to prevent.

We conclude that the trial court correctly ruled that Watkiss & Campbell did not err in filing Intermountain's complaint on January 7, 1988. Indeed, under applicable District of Columbia case law, Watkiss & Campbell filed the complaint five months before the statutory limitations period had expired. Under that case law, the deadline was May 20, 1988, three years from the date when Intermountain first suffered significant injury.

Intermountain also contends that even if the trial court correctly ruled that Watkiss & Campbell acted consistently with applicable District of Columbia law, factual issues reserved for determination by a jury remained to preclude the trial court's dismissal of its claims. According to Intermountain, the first issue is whether Watkiss & Campbell was negligent in failing to undertake reasonable legal research. The trial court found it unnecessary for a jury to determine whether Watkiss & Campbell adequately researched and investigated the question of when the statute of limitations commenced running. According to the trial court, if "[t]hey did it right, even for the wrong reasons, then they are okay."

To qualify for immunity from liability for the consequences of an erroneous legal interpretation of unsettled and uncertain law, most courts demand that lawyers perform the research and investigation necessary to make an informed judgment. *See, e.g., Smith v. Lewis*, 13 Cal.3d 349, 118 Cal.Rptr. 621, 530 P.2d 589 (1975). This is so that the lawyer will follow the best and most logical interpretation out of a number of reasonable interpretations. *See* Mallen & Smith § 17.6, at 507–08, § 17.17, at 543. However, in this case, relevant District of Columbia case law revealed only one answer. Under the case law available to Watkiss & Campbell, a more substantial injury than the incurring of modest attorney fees was required to trigger the statute of limitations, and the most reasonable trigger date was May 20, 1985, the day that Intermountain's application was denied. Therefore, the trial court correctly ruled that no issue of fact remained as to the adequacy of Watkiss & Campbell's investigation and research.

Intermountain also maintains that the trial court usurped the jury's right to decide whether it suffered a significant injury prior to January 7, 1985, the date ultimately chosen by Watkiss & Campbell as the time when the statute of limitations could commence running on the claims against Bloosten & Mordkofsky. This contention is without merit. The trial court had to determine, as if it were a District of Columbia court prior to *Knight*, when Intermountain's claims against Bloosten & Mordkofsky accrued. Every District of Columbia decision applying the statute of limitations to legal malpractice claims treated the issue of when injury occurred as a question of law. *See Byers*, 713 F.2d at 859–60; *Fort Myers Seafood Packers*, 381 F.2d at 262; *Hunt*, 482 F.Supp. at 1022; *Weisberg*, 390 A.2d at 995. Therefore, the trial court was correct in doing likewise.

Intermountain also argues that dismissal of its claims was inappropriate because a jury should have decided if Watkiss & Campbell's sixteen-month delay before finally filing Intermountain's complaint was reasonable. This argument is really an attempt to avoid the consequences of the trial court's ruling that Watkiss & Campbell acted consistently with applicable law. Watkiss & Campbell complied with the law available to it at the time. Thus, under existing law, the complaint was timely filed, and it does not matter whether it was filed one day before the statute expired or two years before it expired. Holding otherwise would abrogate the rule that a lawyer is not required to anticipate changes in the law, a result we decline to effectuate.

Intermountain further argues that the trial court erred in refusing to let a jury determine whether Watkiss & Campbell acted reasonably in failing to advise it of the possible consequences of waiting too long to file its complaint. Intermountain urges us to adopt the rule enunciated in *First National Bank of Clovis v. Diane, Inc.*, 102 N.M. 548, 698 P.2d 5 (N.M.Ct.App.1985). In that case, the court stated:

"[I]f the attorney has reason to believe, or should have reason to believe that there could be some adverse consequences from taking the course advised, he is obligated to so advise his client. But if there is no reasonable ground for him to believe that his advise [sic] is questionable, he certainly has no obligation to advise clients of every remote possibility that might exist."

*Id.* 698 P.2d at 10 (alteration in original) (quoting *Smith v. St. Paul Fire & Marine Ins. Co.*, 366 F.Supp. 1283, 1290 (M.D.La. 1973), *aff'd*, 500 F.2d 1131 (1974)).

However, even under this standard, the trial court did not err. For the same reasons pre-*Knight* case law required more than the incurring of modest attorney fees to trigger the statute of limitations, no reasonable juror could find that a prudent attorney would have questioned Watkiss & Campbell's selected trigger date.

As stated above, pre-*Knight* courts selected dates of seemingly substantial injuries as triggers for the statute of limitations, and the United States Court of Appeals for the District of Columbia Circuit clearly disfavored a rule that would cause litigants to file a complaint upon the first showing of insignificant injury. *Wilson*, 684 F.2d at 119–20. In addition, there was no case that even intimated that the incurring of legal fees could constitute a triggering event. The *Knight* opinion did not and could not cite any prior District of Columbia decision to support its holding that the incurring of attorney fees could trigger the statute of limitations. Moreover, Watkiss & Campbell's experts all testified that the District of Columbia courts before *Knight* had always seemed to require an injury more severe than the mere expenditure for attorney fees. Even Intermountain's expert testified that under pre-*Knight* case law, the most likely trigger date was May 20, 1985, the day Intermountain's application for a television broadcasting license was denied by the FCC's administrative law judge.

In short, District of Columbia case law left little room, absent some "remote possibility," to question Watkiss & Campbell's decision. Therefore, even if we were to adopt the rule proposed by Intermountain, the trial judge's ruling must still be affirmed.

The final issue on appeal is whether the trial court correctly held that the Williamses lacked standing as individuals to assert malpractice claims against Watkiss & Campbell. However, it is unnecessary for us to address this issue. The Williamses asserted the same malpractice claims predicated on the same conduct as the claims asserted by Intermountain. We have held above that Intermountain's claims were correctly dismissed. Thus, even if we were to reverse the trial court and hold that the Williamses have standing to assert their malpractice claims against Watkiss & Campbell, those claims would necessarily have to be dismissed for the same reasons Intermountain's claims were dismissed. Therefore, we refuse to address the Williamses' arguments that their claims were improperly dismissed.

## III. CONCLUSION

We conclude that the trial court (1) correctly ruled as a matter of law that at the

time Watkiss & Campbell filed Intermountain's complaint, District of Columbia law required a more substantial injury than the incurring of modest attorney fees to trigger the applicable statute of limitations; (2) correctly refused to allow a jury to judge the adequacy of Watkiss & Campbell's investigation and research into the statute of limitations issues; (3) properly treated as a question of law the issue of when Intermountain suffered a significant injury; (4) properly treated as irrelevant Watkiss & Campbell's sixteen-month prelude to filing Intermountain's complaint; (5) properly found Watkiss & Campbell not liable for allegedly neglecting to inform Intermountain of the risks inherent in delaying the filing of its complaint; and (6) correctly dismissed the Williamses' individual malpractice claims. We therefore affirm.

DURHAM, J., and PAT B. BRIAN, District Judge, concur.

HOWE, Justice, concurring and dissenting:

I concur except as to that part of the majority opinion which holds that the plaintiff law firm's delay of sixteen months in filing the compliant could not be actionable. While I agree that plaintiffs were not required to anticipate changes in the law, quite apart from that requirement is the duty of attorneys to pursue their client's business with reasonable diligence and promptness.

Rule 1.3 of the Rules of Professional Conduct states, "A lawyer shall act with reasonable diligence and promptness in representing a client." Violations of the rule of conduct can constitute evidence of malpractice. *Williams v. Mordkofsky,* 901 F.2d 158, 163 (D.C.Cir.1990) (citing *Waldman v. Levine,* 544 A.2d 683, 690–91 (D.C.1988)). The statute of limitations is not the only measure of reasonable diligence and promptness. An attorney should be anxiously pursuing his client's case even without the firm hand of an absolute deadline at his back.

Damaging events often occur in the course of litigation. Litigants and material witnesses sometimes die or move away and cannot be found. Assets of defendants are sometimes dissipated or secreted. The longer the delay, the greater the likelihood that some event may occur which will make pursuit of the litigation more difficult or even impossible. In this case, it was a change in the law as to when the statute of limitations commenced running. Had this case been filed only two months earlier, the change in the law would not have affected it.

Plaintiffs and the majority opinion approach this case as if plaintiffs' only duty was to file by the last allowable day and because plaintiffs researched the law and reasonably determined when that last day would be, plaintiffs cannot possibly be liable. I disagree. As I have explained, plaintiffs' duty was to proceed with reasonable diligence, not to needlessly delay until what it thought was the last possible day.

The record before us does not contain any evidence as to the reason for the sixteen-month delay. It does reflect that Mr. Williams was concerned about the delay and urged plaintiffs to file the action months earlier. No finding was made by the trial court as to whether the delay was reasonable under the circumstances. However, because it is not clear to me whether defendants' trial counsel raised and pursued this independent theory of delay, I would remand the case to the trial court to allow defendants to pursue this theory if that court determines that it was adequately raised there.

Having disqualified himself, ZIMMERMAN, C.J., does not participate herein; PAT B. BRIAN, District Judge, sat.

STEWART, Associate C.J., does not participate herein.